**UNITED STATES of America, Appellee,**

v.

**Harry P. CASONI, a/k/a Pete Casoni, Appellant.**

No. 90–5631.

United States Court of Appeals,
Third Circuit.

Argued Jan. 24, 1991.

Decided Dec. 12, 1991.

Rehearing and Rehearing In Banc Denied Jan. 9, 1992.

Hamilton P. Fox, III (argued), Sutherland, Asbill & Brennan, Washington, D.C., for appellant.

James J. West (argued), U.S. Atty., Martin C. Carlson, Sally A. Lied, Asst. U.S. Attys., Office of U.S. Atty., Harrisburg, Pa., for appellee.

Before BECKER and HUTCHINSON, Circuit Judges, and ATKINS, District Judge *.

* Hon. C. Clyde Atkins, Senior District Judge of the United States District Court for the Southern District of Florida, sitting by designation.

OPINION OF THE COURT

HUTCHINSON, Circuit Judge.

### I.

Harry Casoni (Casoni) appeals his convictions on one count of conspiracy to commit a crime against the United States, two counts of interstate travel in aid of racketeering, one count of bribery and four counts of mail fraud. We will affirm. Casoni's convictions followed a jury trial in the United States District Court for the Middle District of Pennsylvania. Casoni argues that various evidentiary rulings the district court made were wrong, that they were prejudicial and that therefore the district court erred in denying his motion for a new trial. In making these arguments, Casoni challenges the district court's admission of testimony by Richard Guida (Guida), attorney for James Gabler (Gabler), and documents Guida had prepared that corroborated Guida's testimony.

More specifically, after Gabler had testified against Casoni under a grant of immunity, Guida's testimony about what Gabler told Guida about Casoni and co-defendant Kenneth Reeher (Reeher) was admitted under Federal Rule of Evidence 801(d)(1)(B) as evidence of a prior consistent statement by Gabler. Guida's written proffer of what Gabler proposed to say, as Guida prepared and submitted it to the United States Attorney in pursuit of Gabler's successful bid for immunity from prosecution, and Guida's notes of a meeting with Gabler were also admitted as evidence of Gabler's prior consistent statement under the "records of regularly conducted activity" exception to the hearsay rule set forth in Federal Rule of Evidence 803(6). Gabler's disclosures to Guida and Guida's notes about them formed much of the basis, but not all the details, of the proffer Guida prepared and presented to the government in Gabler's successful bid for immunity.

■ While Gabler's prior consistent statement would not be hearsay under Rule 801(d)(1)(B), Guida's written out-of-

court declarations about Gabler's prior consistent statement, when offered as evidence of Gabler's prior consistent statement, are hearsay subject to the prohibition found in Federal Rule of Evidence 802 unless they fall within one of the exceptions to the hearsay rule.

At trial and here, Casoni contends that Guida's testimony about what Gabler told Guida, as well as the notes and the proffer, are not admissible under Rule 801(d)(1)(B) as prior consistent statements. Casoni maintains that the statements are not entirely consistent with Gabler's testimony at trial and argues that all three statements were made after Gabler's recognition of his own potential criminal liability gave him a motive to falsify that should have led to the statements' exclusion.[1] With respect to the proffer itself, Casoni attacks not just the admission of the document under Rule 803(6) as Guida's business record but argues that the district court compounded the error when it permitted the jury, during deliberations, to examine the document that Guida had shaped into narrative form from his notes of conference with Gabler. Finally, Casoni attacks a district court ruling that he says improperly prevented him from fully cross-examining Guida about an unrelated government criminal investigation concerning Guida.

For the reasons set forth below, we reject Casoni's argument that Gabler's declarations to his attorney, Guida, were not prior consistent statements within the meaning of Rule 801(d)(1)(B). We hold that Gabler's statements to Guida fall within Rule 801(d)(1)(B)'s definition of prior consistent statements because the rule does not require them to be consistent in every detail with Gabler's testimony at trial. We also hold that they were not inadmissible for the limited rehabilitative purpose the government offered them in this case even though they were made after Gabler's knowledge of the personal risk of criminal

---

1. Although this objection was directed primarily to the effect of Rule 801(d)(1)(B), the objection

implicates the question of relevance under Federal Rule of Evidence 401 and the question of

liability gave him motive to falsify.[2] Gabler's statements to Guida were also relevant within Federal Rule of Evidence 401's broad rule of relevancy, and they were not so unfairly prejudicial as to warrant their exclusion under Federal Rule of Evidence 403. Therefore, we hold that the district court did not abuse its discretion or otherwise err in permitting Guida to testify about Gabler's statements to him. With respect to the notes and the proffer, we hold that the district court abused its discretion in ruling that the hearsay declarations Guida set out in his notes and proffer fall under Rule 803(6)'s business records exception to the hearsay rule. The proffer did not meet Rule 803(6)'s requirement of trustworthiness. Since Guida was present and testified about Gabler's prior statement based on Guida's own recollection, as refreshed by the notes, and the notes were prepared with litigation implicating Gabler in criminal conduct in mind, we also believe the district court abused its discretion in admitting the notes.

If the district court had simply permitted the jury to hear what was in the notes and proffer, however, its error in admitting them would have been unquestionably harmless. The availability to the jury of the exhibits that embodied the notes and proffer during its deliberations, particularly the jury's possession of the proffer, is more troubling. We are nevertheless satisfied that the other evidence against Casoni is so strong that it is highly probable that the jury would have convicted him even if the exhibits containing the notes and the proffer had not been available to it. Accordingly, we hold that this error too is harmless. Finally we hold that the district court did not err in limiting Casoni's cross-examination of Guida about the criminal investigation involving Guida's violations of the federal drug laws that began after Guida interviewed Gabler and prepared the notes and proffer.

unfair prejudice under Federal Rule of Evidence 403.

2. Because of the limited purpose of the government's offer, we need not and do not reach the question that has split the Circuits, i.e., whether

## II.

Casoni and Reeher were indicted by a federal grand jury on April 14, 1989, for their roles in the award of a Pennsylvania state contract to Gabler's company, Gabler Educational Management Services, Incorporated (GEM). Reeher was the director of the Pennsylvania Higher Education Assistance Agency (Agency), a state agency charged with granting and administering federally guaranteed student loans. Casoni was his deputy. The indictments charged one count of conspiracy to commit an offense against the United States, 18 U.S.C.A. § 371 (West 1966); three counts of interstate travel in aid of racketeering, 18 U.S.C.A. § 1952(a)(3) (West Supp.1991) and 18 U.S.C.A. § 2 (West 1969); one count of bribery, 18 U.S.C.A. § 666 (West Supp. 1991) and 18 U.S.C.A. § 2; one count of extortion, 18 U.S.C.A. § 1951 (West 1984) and 18 U.S.C.A. § 2; and six counts of mail fraud, 18 U.S.C.A. § 1341 (West Supp.1991) and 18 U.S.C.A. § 2.

The trial began just over four months later. Among those who testified were Gabler and Loren Carlson (Carlson). Carlson and Gabler were the co-founders of GEM. Their testimony described Casoni's role in a scheme to obtain a valuable state contract for GEM from the Agency. Other witnesses testified about the steps Casoni took to see that the Agency's contract with GEM came to fruition. Yet others testified to Casoni's transferring cash and other gifts to Reeher through third persons. GEM's corporate counsel, Andrew Semmelman (Semmelman), testified about statements Gabler made to him of a plan to secure the contract for GEM by offering valuable but unlawful personal benefits to Casoni and Reeher in exchange for official action favorable to GEM. Semmelman also described certain incriminating representations that Casoni made to him when GEM was about to enter into the contract with Reeher's state agency.[3]

a prior motive to falsify precludes the use of a prior consistent statement as substantive evidence of the facts it sets forth.

3. The evidence of Casoni's guilt, independent of Guida's testimony, notes and proffer, is appro-

Gabler appeared at trial pursuant to an agreement that he would be immune from prosecution if he testified against Casoni and Reeher along the lines set forth in the proffer that Guida had prepared. On cross-examination, Casoni sought to impeach Gabler by suggesting that he had fabricated his testimony to implicate Casoni and Reeher in order to gain immunity for himself. Casoni pointed to various differences in detail between Gabler's testimony at trial and the information he had given the Federal Bureau of Investigation (FBI) during the eight times the Bureau interviewed him in preparation for indictment and trial. For example, Gabler told the FBI that Reeher's demand for a share of the GEM/Agency contract was made at a meeting at Reeher's house. Gabler testified at trial that Reeher's demand was made in a phone call to Carlson before Casoni, Carlson, Gabler and Reeher first met in Chicago, where GEM had its principal office. Gabler had also told the FBI that he could not remember who said that a discussion in a meeting in Reeher's basement should be kept secret. At trial he testified that he remembered it was Reeher who urged they keep the discussion a secret.

In the fall of 1987, Gabler had written a chronology of events surrounding his efforts to land the contract at issue for GEM. He presented this chronology to his first attorney, Scott Adams (Adams). It was inconsistent with his trial testimony. Perhaps, most significantly, Gabler's early chronology lacked any mention of the Chicago meeting that loomed large in his trial testimony. At trial, Gabler said that the written chronology and the story that he told Adams were both lies.

To rehabilitate Gabler the government called Guida, an experienced criminal lawyer to whom Adams had referred Gabler. Guida testified about his first meeting with Gabler. Guida's testimony about this interview was admitted as Gabler's prior consistent statement. Guida said that after hearing Gabler's story he advised Gabler to seek immunity by offering testimony to incriminate Reeher and Casoni. Guida also described and identified the written proffer that he dictated and gave to the government shortly thereafter along with the notes upon which the proffer was based, all in the interest of securing immunity for Gabler. At trial, the notes and the proffer were marked as exhibits, admitted into evidence as Guida's business records, and went out with the jury.

By the time of trial Guida had himself been under investigation by federal prosecutors for drug use in 1986. He was also under investigation for other criminal activity at the time that he testified. The United States Attorney advised the court that the evidence currently available indicated that Guida may not have taken part in any criminal activity. Because of this representation and the fact that Guida was testifying about events that predated the investigation against him by almost two years, the district court did not let Casoni cross-examine Guida about Guida's status as the target of a criminal investigation or Guida's prior use of cocaine. Guida was eventually charged and pleaded guilty to distribution of cocaine and possession of cocaine with intent to distribute.

The jury found Reeher not guilty on all counts, but convicted Casoni on one count of conspiracy, two counts of interstate travel in aid of racketeering, one count of bribery, and four counts of mail fraud. The jury acquitted Casoni on four other counts.

The district court denied Casoni's posttrial motions and sentenced him to five years of imprisonment, seven other concurrent five-year sentences and a $15,000.00 fine. Casoni then filed this timely appeal.

### III.

In 1986, Casoni was the Senior Deputy for Contract Services at the Agency. The Agency is a state governmental organ that guarantees federally subsidized student loans.

priately set out in more detail in the section of this opinion analyzing the question of harmless

error. *See infra,* at 914–919.

When a borrower becomes delinquent in repaying a student loan, federal law requires the holder of the loan to make diligent collection efforts for 180 days. The collection efforts the holder must make include letters and phone calls to the borrower demanding payment. At the lender's request, an intermediate guarantor of the loan, in this case the Agency, must also assist the lender in its collection efforts from the 60th to the 120th days of the delinquency. The intermediate guarantor's efforts are called "preclaim assistance." If the holder properly and diligently makes these efforts to collect, but no payment is forthcoming within 180 days, the student loan is considered to be in default and ultimately the United States government's obligations as guarantor of last resort are triggered.

In the spring of 1986, Congress passed legislation that required additional collection efforts by the intermediate guarantors of delinquent student loans before a loan could be declared in default and so trigger the federal guarantee. Under the 1986 legislation, intermediate guarantors had to continue collection efforts from the 120th day of the delinquency until the 180th day. These later efforts are called "supplemental preclaims assistance." Congress allowed state agencies to contract these additional collection efforts out to private entities. Most of the cost of these supplemental preclaim efforts is underwritten by the federal government.

Gabler and Carlson saw an opportunity in the 1986 law. Gabler had previously worked for the Student Loan Division of the State of Illinois and Van Ru Credit Corporation, a company that lobbied strongly for the supplemental preclaims assistance legislation. Carlson was involved in the student loan industry as an investment banker specializing in bond issues for student loans. To pursue the opportunity they saw, Gabler, with Carlson and others, formed a company, GEM, to offer supplemental preclaims assistance to the state agencies that approve federally subsidized student loans.

Gabler knew Casoni and Reeher through Gabler's work in the student loan industry. In March of 1986, Casoni, Carlson, Gabler and Reeher met in Chicago to discuss the possibility of the Agency's contracting out some of its preclaim supplemental assistance work to GEM. Gabler told Guida that Reeher, during the Chicago meeting, told Gabler and Carlson that Reeher and Casoni were considering retiring from the Agency and seeking employment with a company like GEM.

Later that month, the four met in Harrisburg, Pennsylvania. Casoni helped Gabler make travel arrangements. During the Harrisburg meeting, Gabler openly worried about whether GEM's resources were adequate to handle the $1,500,000.00 supplemental preclaims assistance contract the Agency could give it. A solution was found. It involved billing the Agency up front for services not yet completely performed in order to increase GEM's working capital.

According to Gabler and Carlson, all four went to Reeher's house after dinner that night and discussed an arrangement between GEM and the Agency for preclaim assistance. Carlson testified that they discussed an ownership interest in GEM for Reeher and a job for Casoni with GEM after Casoni retired from the Agency. The possibility of Casoni's retirement as early as the next month was mentioned. No final understanding was reached at this meeting, but those present agreed the discussion about a contract with GEM should be kept secret.

Casoni then started to negotiate his own post-government employment contract with GEM. GEM's counsel, Semmelman, was at first skeptical about hiring Casoni. He objected on both legal and ethical grounds. Casoni hastened to Illinois to quell Semmelman's fears and explained to Semmelman the Agency's statutory framework. He assured Semmelman that there would be a full disclosure of the contract between the Agency and GEM and his own contract with GEM and that this would cure any legal problem because such arrangements were common in Pennsylvania and brought

no opprobrium on the state officials who benefitted from them. Casoni also told Semmelman that he would play no role in the awarding of the contract. Semmelman was persuaded and withdrew his objections on condition of full disclosure.

A tentative agreement on Casoni's role with GEM in the not so distant future followed. GEM was to give Casoni a thirty-five percent commission on the "first contract" he acquired plus a base salary of $130,000.00 "per year." The salary would begin when Casoni went to work for GEM. The phrase "first contract" was a euphemism. It meant the GEM/Agency contract. Casoni hit on the term "first contract" instead of "Agency contract" to avoid public disclosure of his conflicting involvement with the Agency and GEM. The commission on the "first contract" was to be $450,-000.00 in the first year of its performance and commissions on the "first contract" were to continue thereafter during that contract's life. Casoni later sought removal of the "first contract" language in favor of alternative compensation methods with a value equal to the discarded commission on the "first contract." He asked that the draft agreement that included the phrase "first contract" be destroyed and a consulting contract providing equivalent compensation with a more deeply disguised linkage to GEM's proposed contract with Casoni's Agency be substituted.

Apparently Semmelman did not, at first, see the disguised inconsistency between Casoni's promise to stay aloof from the GEM–Agency contract and the terms of Casoni's own employment contract with GEM. In any event, contrary to the promises that he made to Semmelman, Casoni did not step aside in the Agency's handling of the $1,500,000.00 contract between GEM and the Agency for supplemental preclaims assistance. Instead, he pushed other Agency personnel to get this work out to GEM more quickly. While he was still negotiating his own contract with GEM, Casoni drafted part of an equipment contract between GEM and the Agency. Even after he left the Agency, in 1987, Casoni continued to gather information for GEM from internal Agency reports.

The Agency returned an executed contract for supplemental preclaims assistance to GEM on September 17, 1986. The next day, Casoni mailed a signed employment contract to Gabler. Gabler objected to certain terms that Casoni had altered and additional negotiations ensued. Eventually, Casoni mailed a revised copy of the contract to GEM. In a cover letter accompanying the contract Casoni wrote: "Now we can concentrate on hitting the jackpot and having fun at the same time." Appellee's Supplemental Appendix (Supp.App.) at 51. Gabler executed the contract on November 4, 1986. However, Casoni did not leave the Agency until January 1, 1987. Casoni never disclosed his relationship with GEM or the GEM/Agency contract to the public or to any responsible state official, except perhaps Reeher, his boss and head of the Agency. If so, Reeher made no objections.

Between October, 1986 and December, 1987, the Agency paid GEM $1,766,962.22. During this time GEM paid Casoni $360,-000.00 for working about fifty to seventy hours. This made Casoni GEM's highest paid employee, outearning even Gabler.

Casoni gave Reeher various gifts during his first year with GEM. They were petty in comparison to what GEM paid Casoni. He bought air conditioners for Reeher's home. He gave an insurance agent $2400.00 and asked him to write a $2400.00 check to Reeher.

The world of state government in Harrisburg is a small one. In November of 1987, perhaps inevitably, Casoni's relationship with GEM leaked out and became a subject of public knowledge among those on the Harrisburg scene. Gabler, concerned about the effect of these leaks, sought legal advice from a lawyer named Adams. Adams referred Gabler to Guida. Guida had once been the Chief Deputy Attorney General for Pennsylvania. He met with Gabler on November 6, 1987. Guida listened to Gabler's story and advised him that he could be subject to criminal liability. Guida explained Gabler's options to him. The options included a bid for immunity in return for damaging testimony

against Casoni and Reeher. Guida thought testimony against Reeher would be particularly attractive to prosecutors because Reeher, unlike Casoni, had left no incriminating paper trail about his dealings with GEM. Gabler decided to seek immunity. Hoping to save himself from the specter of jail, Gabler authorized Guida to pass Gabler's information on to the authorities.

Guida did not delay. On the night of November 6, a Friday, he contacted Pennsylvania prosecutors and set up a meeting the next morning with representatives of both state and federal prosecutors. The representatives expressed interest in Gabler's proposed testimony against Reeher and Casoni as Guida generally described it but apparently asked for details in writing. Guida left the meeting and began to prepare a narrative proffer of Gabler's testimony. He delivered the proffer to federal authorities on Monday, November 9, 1987.

The proffer was based, in the main, on notes that Guida took during his meeting with Gabler on November 6. Guida described it as "a chronology of the events my client related to me concerning improprieties on the part of high ranking state officials." Appellant's Appendix (App.) at 61. The notes themselves were taken before Guida and Gabler discussed the possibility of immunity.

The proffer, after outlining the sequence of events that led to its delivery, went on to spell out Gabler's employment history and the concept of "supplemental preclaims assistance." It then tracked the creation of GEM and the contacts between Gabler, Carlson, Casoni and Reeher. This portion of the proffer included the following language:

> Mr. Gabler said there was a stong [sic] inference given by Mr. Reeher that any business from [the Agency] would be directly connected to financial opportunities and employment which would flow from GEM, Inc., to Reeher and Casoni personally.

*Id.* at 64. This part of the proffer omitted a statement in Guida's notes that Gabler said "[Casoni] had nothing to do with it.... He wanted to distance himself." *Id.* at 78.

The proffer set out Semmelman's opinions about the propriety of the arrangement with Casoni. It also stated that Casoni provided Semmelman with "purported copies of the PA Code and other Pennsylvania legislation" during Casoni's meeting with Semmelman. *Id.* at 67.

The rest of the proffer narrates Gabler's recollections about the negotiation of both the Casoni and Agency contracts, their terms and Casoni's work history with GEM. The proffer includes statements about the actual signing of the GEM/Agency contract:

> On September 17, 1986, Kenneth Reeher returned to James Gabler a fully executed contract with the Commonwealth of Pennsylvania which purports to be signed by Mr. Reeher on August 13, 1986 said date being changed to August 11, 1986. The contract is approved for form and legality by John Killion, Esq., [Agency] legal counsel, and, in an updated approval section, signed by what now appears to be a stamped signature. The contract returned also has an original received stamp dated August 14, 1986 by the Office of Attorney General but the received stamp is not initialed, nor is the contract number which is part of the stamp filled in on the back of the contract.

*Id.* at 68–69.

The information Guida's notes and proffer contained about Casoni's dealings with GEM for his own benefit, while still acting in an official capacity with respect to the contract between his agency and GEM for supplemental pre-claims assistance, was independently confirmed, not just by Gabler's trial testimony, but also in the trial testimony of Carlson and Semmelman.

### IV.

The sentence the district court imposed on Casoni is included in a final order. Thus, we have jurisdiction over Casoni's appeal by virtue of 28 U.S.C.A. § 1291 (West Supp.1991). The United States District Court for the Middle District of Pennsylvania had jurisdiction over the charges

against Casoni pursuant to 18 U.S.C.A. § 3231 (West 1985).

■ We review the district court's evidentiary rulings for abuse of discretion. *United States v. Stewart*, 806 F.2d 64, 68 (3d Cir.1986). Its decision to limit Casoni's cross-examination of Guida is also reviewed for abuse of discretion. *See United States v. Beros*, 833 F.2d 455, 465 (3d Cir.1987). Our scope of review is so restricted because "[t]he admission or exclusion of evidence is a matter particularly suited to the broad discretion of the trial judge." *In re Merritt Logan, Inc.*, 901 F.2d 349, 359 (3d Cir.1990). That discretion, however, is not unlimited.

If we conclude that any of the evidentiary rulings are an abuse of discretion, then we must review that error to see if it is harmless. Harmless error is "[a]ny error, defect, irregularity or variance which does not affect substantial rights." Fed. R.Crim.P. 52(a). An error is harmless when, as we stated in *United States v. Stevens*, 935 F.2d 1380, 1406–07 (3d Cir. 1991):

> [W]e are ... left with "a sure conviction that the error did not prejudice the defendant," *United States v. Jannotti*, 729 F.2d 213, 220 n. 2 (3d Cir.), *cert. denied*, 469 U.S. 880, 105 S.Ct. 243, 83 L.Ed.2d 182 (1984), and can say that it is "highly probable" that the district court's errors did not contribute to [sic] jury's judgment of conviction. *Government of Virgin Islands v. Toto*, 529 F.2d 278, 284 (3d Cir.1976).

With these standards in mind, we turn to the merits of Casoni's arguments.

## V.

On the merits, we reject all of Casoni's contentions save one. We agree with Casoni's argument that the district court committed error when it allowed Gabler's notes and proffer to be admitted and then compounded the problem by letting the jury take them to the jury room and examine it during deliberations.

The problem is particularly acute with respect to the proffer. It was a highly incriminating narrative carefully constructed by skilled criminal defense counsel seeking immunity for his client in exchange for testimony against Casoni and a prominent state government official. It was especially incriminating with respect to Casoni. A skilled criminal advocate like Guida would be duty bound to shape and prepare the proffer in the manner he thought most likely to accomplish his goal of securing immunity for his client. Guida was frank about this. He said he recommended that Gabler offer to incriminate Casoni and Reeher because a prosecutor would be highly interested in convicting such high-ranking public officials of crimes involving corruption. Moreover, the proffer's presence in the jury room could have emphasized the prosecution's version of events over Casoni's testimonial denials. Nevertheless, this record contains so much other damning evidence against Casoni that we hold the jury's possession of Guida's notes and proffer during its deliberations was harmless error. We do so because we believe that Casoni's convictions would have still been highly probable if the jury had not had before it during its deliberations Guida's notes and proffer of what Gabler proposed to and indeed did say about Casoni in return for his own immunity from prosecution.

## A.

Casoni objected to Guida's testimony about the proffer, to the district court's admission of the proffer and the notes upon which the proffer was based and to their presence in the jury room during the deliberations. Casoni's objections fall into two general categories. He first attacks all of the evidence about Gabler's statements to Guida (Guida's testimony, Guida's notes about his interview with Gabler and the proffer Guida prepared) as outside the category of prior consistent statements admissible under Rule 801(d)(1)(B). Second, he attacks the admission of Guida's notes and the proffer as hearsay that does not fall within the business record exception of Rule 803(6), Rule 803(5)'s exception for recorded recollection or any other exception

to the hearsay rule.[4] He also argues that even if the notes and proffer were admissible as exceptions to the hearsay rule, it was error to let the jury have them while it deliberated.

### 1.

We start with a general discussion of the Federal Rules of Evidence that are central to Casoni's arguments against the admission of Guida's testimony and his written declarations about what Gabler said.

Federal Rule of Evidence 801(c) states:

"Hearsay" is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.

Federal Rule of Evidence 802 provides:

Hearsay is not admissible except as provided by these rules or by other rules prescribed by the Supreme Court pursuant to statutory authority or by Act of Congress.

Prior consistent statements of a witness are expressly excluded from the category of hearsay and are admissible under Rule 801(d)(1)(B) for the purpose of rehabilitating a witness if certain conditions are met. Federal Rule of Evidence 801(d)(1)(B) provides a prior statement is admissible if:

the declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement and the statement is . . .

(B) consistent with the declarant's testimony and is offered to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive.

### 2.

Casoni concedes, as he must, that a prior consistent statement by Gabler would be admissible to rebut any inference Casoni's cross-examination raised that Gabler fabri-

cated his testimony or had an improper motive in giving it. He argues instead that Gabler's prior statement to Guida is not consistent because it differs in some of its details from Gabler's testimony at trial. Moreover, other inconsistencies that the cross-examination revealed in Gabler's story were not mentioned in his earlier statements to Guida and Guida's statements on his behalf in the proffer. Casoni concedes that Gabler's statements to Guida were generally consistent with Gabler's trial testimony. Casoni argues, however, that Gabler's statements to Guida were not consistent with all of Gabler's testimony on direct examination and that some of the inconsistencies concerned differences specifically highlighted in the cross-examination of Gabler. For example, at trial Gabler said that he learned of Reeher's demands for a share of GEM before their first meeting. In his FBI interview, Gabler said that this demand was made at the second meeting. Guida's testimony about Gabler's statements and the proffer agree with the FBI version that was used to impeach him and not the trial version that the cross-examination attacked. Other contradictions about who ordered the second meeting's details to be kept secret or whether Carlson was kidding when he talked to Gabler about destroying documents concerning Casoni's contract with GEM were not covered by Guida's testimony or the proffer. Casoni also contends that the proffer could contain no *prior* statement consistent with Gabler's testimony at trial because the proffer was made *after* Gabler wrote the untruthful chronology that he gave to his first attorney, Adams. Casoni maintains that Gabler's earlier untruthful chronology shows that he had a motive to fabricate his testimony.

■ The government correctly responds that prior consistent statements are not limited to statements concerning specific inconsistencies brought out on cross-exami-

---

4. Casoni did not specifically refer to Rule 803(5) either here or in the district court. Nevertheless, he fairly alerted the district court to this problem when he argued that the admission of the notes and proffer as exhibits was unnecessary because Guida was present and available to testify about what Gabler told him. He went to the nub of the problem when he said that if the government could have such notes and proffer admitted, there would be no need for Guida's live testimony.

nation. Rather, there need be only a suggestion that the witness consciously altered his testimony in order to permit the use of earlier statements that are generally consistent with the testimony at trial. *See United States v. Vest,* 842 F.2d 1319, 1329 (1st Cir.), *cert. denied,* 488 U.S. 965, 109 S.Ct. 489, 102 L.Ed.2d 526 (1988); *cf. United States v. Brantley,* 733 F.2d 1429, 1438 (11th Cir.1984) (court need not exclude portions of prior consistent statement "that do not relate specifically to matters on which the defendant has been impeached"), *cert. denied,* 470 U.S. 1006, 105 S.Ct. 1362, 84 L.Ed.2d 383 (1985).

■ Casoni's cross-examination of Gabler suggested that Gabler fabricated his trial testimony. The specific inconsistencies brought out in the cross-examination were merely evidence from which Casoni asked the jury to infer fabrication. The differences Casoni mentions go to the weight of the prior statement as evidence, not its admissibility.

### 3.

■ We also reject Casoni's contention that Gabler's prior statements to Guida were inadmissible under Rule 801(b)(1)(D) because Gabler had an improper motive to fabricate his statements to Guida. Casoni sees that improper motive in Gabler's natural desire to save himself from criminal liability by giving damning false testimony against Casoni and Reeher, important public officials, whose conviction would be of more interest to prosecutors than Gabler's. Casoni reasons that this motive would have been present even before Gabler ever met with his first lawyer, Adams, because the qualms he had about the legality of the GEM/Agency/Casoni arrangement motivated him to seek legal advice. Casoni notes that Gabler admitted at trial that he lied about his activities to Adams. Casoni says this pattern of behavior shows that Gabler's motive to fabricate preceded his meeting with Guida.

■ Casoni's argument simply proves too much. It stands Rule 801(d)(1)(B) on its head. The very basis the rule gives for admission of the statement—to rebut recent fabrication, improper influence or motive—becomes the basis for the prior statement's exclusion. Casoni's argument might have force to a jury, but it does not preclude the statement's admission. When a motive to fabricate exists at the time a prior consistent statement is made, the statement is not relevant to rebut an implication of recent fabrication. Accordingly, the case law indicates that the existence of a motive to fabricate when the statement is made is a matter of relevance. In sum, Casoni's argument about Gabler's motive to fabricate his statement to Guida is more properly considered under the rules relating to relevancy. *See United States v. Harris,* 761 F.2d 394, 399 (7th Cir.1985); *United States v. Hamilton,* 689 F.2d 1262, 1273–74 (6th Cir.1982), *cert. denied,* 459 U.S. 1117, 103 S.Ct. 753, 74 L.Ed.2d 971 (1983). *But see United States v. Quinto,* 582 F.2d 224, 234 (2nd Cir.1978).

Rule 401 defines relevant evidence. It provides:

"Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.

Not all relevant evidence is admissible, however. Rule 403 provides:

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

Gabler's prior statement to Guida is relevant under Rule 401. Rule 801(d)(1)(B) does not impose the requirement that the statement must have been made before the motive to fabricate. Here, we cannot say as a matter of law that the motive to fabricate arose when Casoni says it did, as opposed to when the government says it did, *i.e.,* when Gabler was negotiating for immunity. The statement in question antedated Gabler's negotiation for immunity. Accordingly, the decision to admit the

statement as relevant was within the district court's discretion.

Additionally, we do not believe the district court abused its discretion in admitting evidence of Gabler's prior consistent statements to Guida for the purpose of buttressing Gabler's credibility despite the provisions of Rule 403. Certainly, considering all the circumstances, we cannot say the probative value of Gabler's prior statement on the issue of fabrication was substantially outweighed by the danger of unfair prejudice. The prior statement was not likely to confuse the issues or mislead the jury. For the purpose of rebutting a charge of recent fabrication, the only purpose for which the statement was admitted, the prior statement was not cumulative.

### 4.

The notes of the Advisory Committee state that Rule 801(d)(1)(B) was intended to make prior consistent statements admissible not only to rehabilitate the credibility of a witness but also as substantive evidence of the events asserted. Fed.R.Evid. 801 advisory committee's note. This interpretation was apparently accepted by the House and Senate Committees on the Judiciary when they considered the rules as submitted by the Supreme Court. *See* S.Rep. No. 1277, 93rd Cong., 2d Sess., *reprinted in* 1974 U.S.Code Cong. & Admin.News 7051, 7062–63; H.R.Rep. No. 650, 93rd Cong., 2d Sess., *reprinted in* 1974 U.S.Code Cong. & Admin.News 7075, 7087. Despite the fact that its use as substantive evidence is not supported by the language of the rule, *see* Fed.R.Evid. 801(d)(1)(B), prior consistent statements have been accepted as substantive evidence of the facts they recite by a number of courts. *See, e.g., United States v. Provenzano,* 620 F.2d 985, 1002 n. 21 (3d Cir.), *cert. denied,* 449 U.S. 899, 101 S.Ct. 267, 66 L.Ed.2d 129 (1980).

Admittedly, the rule is confusing. It first states that hearsay is an out-of-court statement offered to prove the truth of the matter asserted. Fed.R.Evid. 801(c). The rule then goes on to say that a statement is not hearsay if it is "consistent with the declarant's testimony and is offered to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive." Fed.R.Evid. 801(d)(1)(B). Indeed, it is not; for it is then not offered to prove the truth of the matter asserted. In *Provenzano,* this Court noted the puzzling difference between the conditions the rule imposes on admission of a prior consistent statement and its use as substantive evidence as envisioned by the Advisory Committee. *See Provenzano,* 620 F.2d at 1002 n. 21 ("Evidence admitted under rule 801(d)(1)(B), while conditioned upon the need to rebut a charge of fabrication, may be used by the jury for any substantive purpose to establish the truth of what it says. Fed.R.Evid. 801(d)(1)(B) Advisory Comm. Note."). This still leaves us with a problem concerning the internal logic of the rule itself, which takes a prior consistent statement out of the hearsay category because it is offered only for rehabilitative purposes instead of for the truth of the matter asserted but then inconsistently permits its use to prove the truth of the matters it asserts. Nevertheless, under the Advisory Committee's interpretation, an interpretation we seem to have accepted in *Provenzano,* the government could have offered Guida's testimony, the notes and the proffer as substantive evidence of the events they described. The government, however, did not choose to do so but instead limited the purpose to rehabilitation, as shown by the following colloquy:

> THE COURT: I think the purpose of this [Guida's testimony] is only to establish what was said to him and in turn furnished to you [the government] I guess.
>
> THE GOVERNMENT: Yes, Your Honor.

Supp.App. at 102. Because the evidence was offered only for rehabilitative purposes, we do not reach or decide the issue of whether this prior consistent statement offered as substantive evidence of the events it described would be admissible under the plain language of Rule 801(d)(1)(B). Accordingly, those cases which hold that a prior consistent statement must pre-date a motive to fabricate when the statement is used as substantive evidence have no appli-

cation in Casoni's case. *See United States v. Harris,* 761 F.2d 394, 399 (7th Cir.1985) (listing cases). The admission of evidence of Gabler's prior statements to Guida did not violate Rule 801(d)(1)(B).

## B.

The inclusion of extraneous opinions and statements by others in the proffer itself is another matter, and Casoni also attacks the proffer because it included such information. He takes special exception to several conclusions of law that Guida advanced in the proffer. They include the statement that there were "illegal activities on the part of high-ranking officials." App. at 61. Casoni says the proffer includes other inadmissible opinions by Guida such as the statement in the proffer that it was "obvious" that the Casoni contract was linked with the GEM contract. *Id.* at 64. Still other language, such as the reference to Casoni's providing Semmelman with "purported" copies of the Pennsylvania Code, is said to be suggestive. *Id.* at 67. Finally, the whole proffer is said to be compromised by Guida's statement that he might have misrepresented some details of what Gabler told him. Though this last argument is presented primarily in the context of Rule 801(d)(1)(B), it can also be considered in the hearsay context. Considered either way, it does not persuade us that the admission of Guida's testimony, the notes or the proffer was an abuse of discretion. Basically, the proffer did no more than summarize the government's case, in narrative form, a case that was fully supported by overwhelming independent evidence of Casoni's guilt, and the extraneous statements Casoni points to had only *de minimis* import.

## C.

Casoni has additional arguments, however, that relate only to the notes and proffer which we now consider.

### 1.

The admission of narrative proffers of incriminating testimony against prominent citizens or officials by a person who is himself subject to criminal liability but seeks immunity from prosecution for his own admitted criminal conduct by implicating another raises troubling issues that go beyond mere technicalities in the application of Rule 801(d)(1)(B) relating to the use of prior consistent statements.

Consider the problem defense counsel faces when confronted with damning testimony by a guilty informant. Persons who face criminal punishment are often ready to point the finger at another if they believe they can escape or reduce their own punishment by doing so. Prosecutors are understandably anxious to get testimony against prominent persons whom they believe are involved in corrupt practices. Yet, the moment defense counsel begins any cross-examination that casts doubt upon the credibility of the witness testifying under immunity, he risks opening the door to admission of a narrative containing incriminating statements that the government could not otherwise have had admitted. Under the Advisory Committee's view of the rule, those statements can then be considered by the jury, not just as evidence of the credibility of an informant seeking to save himself at the expense of others, but as substantive evidence of the events the proffer describes, events which may not only be highly material to guilt or innocence but may not otherwise appear in the record. *See United States v. Asher,* 854 F.2d 1483, 1501–15 (3d Cir.1988) (Higginbotham, J., dissenting), *cert. denied,* 488 U.S. 1029, 109 S.Ct. 836, 102 L.Ed.2d 969 (1989).

Thus, counsel for a criminal defendant before cross-examining a witness testifying under immunity must consider whether the potential gain from use of cross-examination is worth the risk of opening the door to a narrative proffer skillfully designed to induce a grant of immunity, a proffer that may contain material substantive evidence of guilt the government could not otherwise produce. When witnesses testify under immunity, cross-examination on the damning testimony those witnesses give is often crucial, but the risk in opening the door to a proffer is intensified. The Advis-

ory Committee's view that prior consistent statements are substantive evidence of the facts they relate to is likely to chill a cross-examiner's effort to ferret out the truth that hides within conflicting stories, through the exposure of inconsistencies, assumptions or bias in the testimony of a government witness testifying under immunity. Unrestricted use of statements in a proffer of immunity poses deep questions affecting the functioning of our adversary system. The problems posed are intensified if the proffer is not only read or described but also admitted as an exhibit and presented to the jury for ready reference throughout deliberations. We address Casoni's arguments concerning the use the government made of the notes and proffer in that context; always, however, examining those issues more narrowly in relation to the text of the rules, their legislative history and their common law background.

### 2.

Essential to Casoni's attack on the admission of the notes and proffer is his argument that they should be treated as Guida's assertions because Guida recorded and narrated a summary of Gabler's statement and then transcribed and corrected it before presenting it to federal authorities. This argument, that the statements in the notes and proffer were Guida's assertions and therefore inadmissible because the prior consistent statement that Rule 801(d)(1)(B) permits must be a statement by Gabler, the witness whose credibility the statement was supposed to rehabilitate, takes us directly into the hearsay provisions of Rules 801 and 802. If the notes and the proffer are Guida's statements, not Gabler's, they must pass two hurdles to admission.[5] Thus, the government's argument that the proffer and the notes can be admitted under the rule on prior consistent

statements clears only the first hurdle if the notes and proffer must first qualify under Rule 801(d)(1)(B) and then qualify for admission under one of the exceptions to the hearsay rule. Our earlier analysis of Rule 801(d)(1)(B) establishes that the notes and proffer are prior statements consistent with Gabler's trial testimony. *See supra* at 902–06. Accordingly, they pass the first test.

### 3.

■ Before considering the merits of the second part of this "double hearsay" problem, we must deal with the government's argument that Casoni did not properly preserve this objection. If so, we must review Casoni's hearsay arguments under a plain error standard. Casoni, in support of his objection that the notes and proffer were not admissible as prior consistent statements, advanced arguments that the notes and proffer were not statements made by Gabler and that they included Guida's unfairly prejudicial opinions. It is because of the specifics Casoni referred to in advancing these arguments that the government says he failed to preserve his contention that the notes and proffer did not clear the second hearsay hurdle to their admission. Essentially, the government contends that Casoni waived his hearsay argument by not making a specific enough objection at trial.

The government's waiver argument cuts too fine. Casoni did object to both the proffer and the notes on the grounds that they were not admissible as prior consistent statements and that they were not business records. A fair reading of the record convinces us that Casoni fairly alerted the district court to his argument that the notes and proffer were Guida's out-of-court statements about what Gabler said and as such were inadmissible, even if consistent with Gabler's trial testimony.[6]

---

**5.** Were it not for Rule 801(d)(1)(B)'s removal of the class of prior consistent statements from the class of hearsay assertions, we could describe this issue as a double hearsay problem. Despite this problem in the logic of classes, the analogy of the situation we examine to what has been called "double hearsay" is so strong that we will occasionally use that apt and convenient phrase

to describe our problem as a kind of mnemonic shorthand.

**6.** Casoni's characterization of the proffer as suggestive or conclusory is not waived because "line-by-line" objections were not made in the district court. *See* Fed.R.Evid. 103(a)(1).

Here and in the district court, Casoni plainly said that while the proffer is based on Gabler's statements to Guida, it is Guida's statement, not Gabler's. As an example, Casoni pointed to the statement in Guida's notes that Casoni wanted to distance himself from the GEM/Agency contract, a statement that does not appear in the proffer. This, according to Casoni, shows that the proffer was "crafted" by Guida in his role as a counselor and so is not a "statement" by Gabler.

Since we think Casoni fairly raised the "double hearsay" issue, we will consider the merits of Casoni's argument that the notes and proffer Guida prepared fall within the definition of hearsay.

### 4.

■■■ The Federal Rules of Evidence define hearsay. They say:

> "Hearsay" is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.

Fed.R.Evid. 801(c). The matter asserted in Guida's notes and proffer is that Gabler told Guida the facts those documents contain. In classic terms, the notes and proffer say that (a) Guida said (b) Gabler said (c) Casoni traded his public duty for private gain. The notes and proffer were written assertions Guida made outside the courtroom in which he was testifying, and they were offered to prove the truth of the assertion that Gabler made them. Thus, they come within Rule 801(c)'s definition of hearsay.

### 5.

Still, our agreement with Casoni that the notes and proffer are Guida's statements and so only hearsay evidence of Gabler's prior statement does not solve Casoni's problem. Recognizing the hearsay nature of Guida's written statements, the district court nevertheless overruled Casoni's objections to their admission by concluding they fell under the business records exception of Rule 803(6).

Casoni contends that, unlike the usual business record, the information Guida recorded was not routine, it was not based upon Guida's personal knowledge and Gabler was not passing it to Guida in the normal course of business. In this context, Casoni renews his argument that Gabler had a motive to fabricate that is absent from the usual business record. Moreover, unlike most business records that are recorded fairly soon after the events took place, Casoni notes that here there was more than a one year time lag between the events and Guida's recording of them.

The government contends simply that the notes and proffer are business records because they are normally prepared in client interviews, are kept in the normal course of business and are relied on by Guida in the normal course of his business. The rules of evidence define a business record as:

> A memorandum ... in any form, of ... events ... made at or near the time ... from information transmitted by ... a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, ... all as shown by the testimony of the custodian or other qualified witness, unless the source of the information or the method or circumstances of preparation indicate lack of trustworthiness. The term "business" as used in this paragraph includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit.

Fed.R.Evid. 803(6).

The government cites only one case dealing with the treatment of an attorney's memorandum under the business record exception to the hearsay rule. In *MCI Communications Corp. v. American Tel. & Tel. Co.*, 708 F.2d 1081, 1142–43 (7th Cir.), *cert. denied*, 464 U.S. 891, 104 S.Ct. 234, 78 L.Ed.2d 226 (1983), the Seventh Circuit avoided deciding whether a corporate counsel's memorandum to certain managers of the firm was a business record. The memorandum interpreted parts of a Federal

Communications Commission decision and the effect of an injunction that MCI had recently obtained from a federal district court. The attorney who prepared the memorandum stated that he regularly prepared similar memoranda on topics relevant to the corporation's business. *Id.* at 1142. The Seventh Circuit said:

> Although [the district court] may have erred in refusing to admit the document on [the] grounds [that it was a business record], the error was harmless. The evidence was merely cumulative....

*Id.* at 1143.

Casoni says the Seventh Circuit's dictum concerning admission of an attorney's memo has no application here. He cites *United States v. Snyder,* 787 F.2d 1429, 1434 (10th Cir.), *cert. denied,* 479 U.S. 836, 107 S.Ct. 134, 93 L.Ed.2d 78 (1986). In *Snyder,* the court held that an investigating officer's written report that contained statements by inmates was not a business record. Because the business records exception is "based on a presumption of accuracy" that stems from the precision that accompanies records kept in the ordinary course of business, the court stated that the investigator's own observations fell within the business records' exception to the rule against hearsay, but the inmates observations did not. *Id.* at 1433. In *Snyder,* the court reasoned that the prisoners had no business interest in the accuracy of their statements. Guida's notes and proffer, Casoni says, are even worse. Gabler's interest, and thus Guida's as his advocate, lay in exaggerating the improprieties of Casoni and Reeher in the interest of securing immunity for Gabler.

We summarized the requirements of Rule 803(6) in *United States v. Furst,* 886 F.2d 558 (3d Cir.1989), *cert. denied,* 493 U.S. 1062, 110 S.Ct. 878, 107 L.Ed.2d 961 (1990). There we said:

> The business record exception to the hearsay rule requires that the witness who lays the foundation for the admission of the evidence [must] testify that: (1) the declarant in the records had knowledge to make accurate statements; (2) that the declarant recorded the state-

ments contemporaneously with the actions which were the subject of the reports; (3) that the declarant made the record in the regular course of the business activity; and (4) that such records were regularly kept by the business.

*Id.* at 571.

 If we interpret Rule 803(6) as in *Furst,* an attorney's objective memorandum may sometimes be a business record. According to Casoni, though, Guida's notes and proffer present special problems. First, while Guida's memorandum was made as he learned of the information, Gabler was relaying his version of the facts over a year after they had occurred. Since the government limited the purpose of the notes and proffer to proof of Guida's assertion that Gabler made the statements they contain, Guida himself certainly had the knowledge necessary to make accurate statements about what Gabler previously said. After all, Gabler made the statements directly to Guida. Thus, the memorandum does not run afoul of *Furst*'s initial requirement of knowledge.

The memorandum may pose a problem under the second condition *Furst* imposes, *viz.* contemporaneous recording. *See Furst,* 886 F.2d at 571. Even though it is undisputed that Guida heard what Gabler said and that Gabler had personal knowledge about the events he recorded, Gabler's delay in reporting them may undercut the trustworthiness of Gabler's statements to some degree. In this connection, Casoni relies on *United States v. Kim,* 595 F.2d 755, 760–63 (D.C.Cir.1979). There, the court held that a delay of two years between the event and its recording was a circumstance demonstrating a lack of the trustworthiness courts have generally held the rule on business records requires. *See Kim,* 595 F.2d at 760–63. We do not, however, place great weight on the lapse of time between Gabler's experience of the events Guida noted and shaped into his narrative proffer because Guida's records were not offered to show the events occurred but only that Gabler so described

them.[7]

Our opinion in *Furst* does not include trustworthiness in the four specific requirements it lists, but all of the four listed seem designed to insure some degree of reliability. Moreover, in *Furst*, we did recognize that Rule 803(6) requires us to consider the trustworthiness of a record. *Cf. Furst*, 886 F.2d at 573 (analyzing trustworthiness of relevant documents found in bank files).

The government seeks to have admission of the notes and the proffer upheld by characterizing them as "business records." Casoni's counsel argues that Gabler's statements to Guida could not be prior consistent statements because they were not made "prior to a motive to fabricate" or *ante litem motam*. Our analysis has focused on a closely related problem: Guida's motive or state of mind as he took down Gabler's statements and later converted those notes into a proffer that was handed over to the United States Attorney's Office in Harrisburg.

 There may at first glance seem to be tension between Rule 803(6)'s express inclusion of trustworthiness as a factor in its application and the Advisory Committee's criticism of pre-existing case law that spoke in terms of motivation under the old "shop book rule."

Rule 803(6)'s version of the modern business records exception to the rule against hearsay shows considerable evolution from its common law antecedent. The legislative history of Rule 803(6), as shown in the statement in the Advisory Committee's notes on Rule 803(6) disparaging use of the motivation factor in considering a shopkeeper's entries in his original records of account, illustrates the difference between the original rationale and current thinking. The Advisory Committee, criticizing the common law rationale of absence of moti-

vation to misrepresent as a basis for admitting the hearsay statements that make up business records, said:

> The direct introduction of motivation is a disturbing factor, since absence of motivation to misrepresent has not traditionally been a requirement of the rule; that records might be self-serving has not been a ground for exclusion.

Fed.R.Evid. 803(6), Advisory Committee's note. In support, the Committee went on to quote *Hoffman v. Palmer*, 129 F.2d 976 (2d Cir.1942) (Clark, J., dissenting): "I submit there is hardly a grocer's account book that could not be excluded on that basis." *Id.* at 1002.

The Federal Rules of Evidence treat such records as exceptions to the hearsay rule. Federal Rule of Evidence 803(6) does not explicitly mention the phrase *ante litem motam*. It does say records of regularly conducted activity are not admissible if "the source of information or *the* method or *circumstances of preparation indicate lack of trustworthiness.*" *Id.* (emphasis added).

In this case, our consideration of whether the notes and proffer meet this general trustworthiness requirement is affected by the professional relationship between Guida and Gabler. The proffer and the notes were statements by a declarant, who, as Gabler's attorney, had a motive to minimize Gabler's criminal responsibility and maximize that of Gabler's potential co-defendants, including Casoni, in an effort to obtain immunity for Gabler.[8] In addition, Gabler, like the prisoners in *Snyder*, was under no business duty to report or record the events that he talked about. Of importance in this case, however, is the principle referred to that restricts the admission of documents that could otherwise fall under an exception to the hearsay rule if they were prepared for use in litigation. The

---

7. Arguably, the notes, at least, seem to meet *Furst*'s third and fourth requirements. An attorney prepares notes of client interviews in the regular course of the practice of law and law offices regularly keep and retain those notes.

8. We recognize that Gabler's, and consequently Guida's, motive to exaggerate was at its strong-

est with respect to Casoni's superior, Reeher, whose prominent position was more likely to interest the prosecutors than Casoni's part, since Reeher's part in the criminal scheme was not easily shown without Gabler's testimony. Indeed, Guida so testified noting that Reeher, unlike Casoni, had left no paper trail.

presence of a motive to falsify is a more general analogue to the principle summed up in the Latin phrase *ante litem motam.* As stated, Casoni renews his argument based on a pre-existing motive to falsify in the hearsay context.[9] The proffer and the notes were prepared in connection with a criminal proceeding on behalf of a person seeking to escape criminal liability after his exposure was apparent.

Accordingly, we think the portion of the rule relating to the trustworthiness of testimonial or documentary evidence offered for admission can, however, be examined in some cases in light of the principles underlying the common law restriction of statements made out of court to statements *"ante litem motam."* [10] In doing so, however, we must be careful not to make motivation a general overriding concern in the application of Rule 803(6).

The phrase *"ante litem motam"* has been defined as follows:

At time when declarant had no motive to distort truth. Before suit brought, before controversy instituted. Also, before controversy arose.

Black's Law Dictionary 84 (5th ed. rev. 1979).

Wigmore's discussion of the principle restricting business records to those prepared *ante litem motam* is confined to the subject of statements of facts against interest. 5 Wigmore, Evidence §§ 1455–1477 (Chadbourne rev.1974). In that connection, Wigmore notes that preparation *ante litem motam* is not required under the hearsay exception afforded to statements of facts against interest, but cautions that it is a factor that enters into consideration on a case-by-case basis. *Id.* §§ 1464, 1467.

■ The restriction on admissibility summed up in the phrase *ante litem motam* has been a factor for consideration but not a requirement in connection with the admissibility of kinds of evidence other than business records. *See Health Products Corp. v. Ex-Lax Mfg. Co.,* 22 F.2d 286, 287 (2d Cir.1927) (L. Hand, J.) ("The plaintiff attempts to discredit the defendant's proof ... by appealing to the well-known reluctance of courts to place much weight upon ex parte experiments. The reasons which justify that reluctance do not extend to what is done ante litem motam, when there is no motive to fabricate.") (citation omitted).

In discussing the rules of evidence relating to regular entries made in the ordinary course of business, the immediate precursor to 803(6), Wigmore devotes a section to

---

9. Admittedly, Casoni concentrates on Gabler's motive to falsify, not Guida's motive to falsify in Gabler's behalf. Still, considering the nature of an immunity proffer and the fact that Casoni has renewed the issue in the Rule 803(6) context, we think consideration of Guida's purpose in connection with the proffer's trustworthiness is appropriate. Moreover, Casoni argued that Guida's testimony about Gabler's prior consistent statements was recently fabricated because Guida was under criminal investigation. In this light, the notes and proffer were arguably admitted to show that Guida's testimony recounting Gabler's incriminating statements about Casoni was not fabricated, since the notes and proffer predated the criminal investigation that was ongoing at the time of trial.

10. *See Palmer v. Hoffman,* 318 U.S. 109, 63 S.Ct. 477, 87 L.Ed. 645 (1943), affirming the exclusion of an accident report offered by a railroad's trustees who were the defendants in the case under the precursor to Rule 803(6) because the report was made in anticipation of litigation and not in furtherance of the business of running a railroad. *Id.* at 111–12, 63 S.Ct. at 479–80. The Advisory Committee's Notes to Rule

803(6) mention *Palmer* in disavowing any connection between *ante litem motam* as a requirement for admission and the rule:

While the [Supreme Court's opinion] mentions the motivation of the engineer only obliquely, the emphasis on records of routine operations is significant only by virtue of the impact on motivation to be accurate. Absence of routineness raises lack of motivation to be accurate. The opinion of the Court of Appeals had gone beyond the mere lack of motive to be accurate: the engineer's statement was "dripping with motivations to misrepresent." *Hoffman v. Palmer,* 129 F.2d 976, 991 (2d Cir.1942). The direct introduction of motivation is a disturbing factor, since absence of motivation to misrepresent has not traditionally been a requirement of the rule; that records might be self-serving has not been a ground for exclusion.

Fed.R.Evid. 803(6) Advisory Committee note. Thus, we are satisfied Rule 803(6) contains no general rule limiting admissible business records to those prepared *ante litem motam.*

"no motive to misrepresent." *Id.* § 1527. The section reads:

It is often added that there must have been *no motive to misrepresent.* This does not mean that the offeror must show an absence of all such motives; but merely that if the existence of a fairly positive countermotive to misrepresent is made to appear in a particular instance the entry would be excluded. This limitation is a fair one provided it not be interpreted with overstrictness. The exclusion of the notorious Fleet registers of marriage illustrates the kind of circumstances that call for the application of this requirement.

*Id.* § 1527 (footnote and cross-reference omitted). This analysis places the restriction of business records to those prepared *ante litem motam* in the realm of a "consideration," not a "requirement," of the common law rule concerning regularly made entries in business records. While preparation of records *ante litem motam* is not a prerequisite to their admission under Rule 803(6), we think it is a circumstance surrounding a document's preparation that is here appropriate for consideration in evaluating the document's trustworthiness.

The Advisory Committee seems to have recognized that the impact of motive on

trustworthiness may still be a factor for consideration on a case-to-case basis in deciding whether a particular record qualifies for admission under Rule 803(6).[11] It is in that case-to-case context that we approach the effect of the general factor of trustworthiness on the admissibility of Guida's notes and proffer under Rule 803(6)'s exception to Rule 802's preclusion of hearsay evidence.

■ Consistent with that approach, we do not think the proffer of an attorney seeking immunity from criminal prosecution for his client has the element of trustworthiness that the business records exception of Rule 803(6) requires. *See Furst,* 886 F.2d at 573; *Snyder,* 787 F.2d at 1434; *Kim,* 595 F.2d at 760–63; 4 J. Weinstein & M. Berger, *Weinstein's Evidence* ¶ 803(6)[07], at 803–206 to 803–212 (1988) (hereinafter *Weinstein's Evidence* ). Moreover, we do not think that preparation of a proffer for a client seeking immunity can be treated as a record routinely prepared in the "business" of the practice of law. It is, instead, a product of the advocate's craft, consciously shaped to serve a client's end. It is a tool of controversy, not a routine record of fact. Accordingly, we hold that the district court erred in admitting the proffer as a business record under Rule 803(6).[12] We hasten to add that our

**11.** The Advisory Committee cautioned that:

Hesitation must be experienced in admitting everything which is observed and recorded in the course of a regularly conducted activity. Efforts to set a limit are illustrated by *Hartzog v. United States,* 217 F.2d 706 (4th Cir.1954), error to admit worksheets made by since deceased deputy collector in preparation for the instant income tax evasion prosecution, and *United States v. Ware,* 247 F.2d 698 (7th Cir. 1957), error to admit narcotics agent's records of purchases. Consequently the rule proceeds from the base that records made in the course of a regularly conducted activity will be taken as admissible but subject to authority to exclude if "the sources of information or other circumstance indicate lack of trustworthiness."

Fed.R.Evid. 803(6) advisory committee's note; *see supra* at 911.

**12.** We have not separately analyzed the question of whether a proffer a lawyer prepares in support of a client's bid for immunity from criminal prosecution meets the Rule 803(6) requirement of a record ordinarily prepared and regu-

larly kept in the course of the practice of law. Even if it could be so considered, the trustworthiness problem, as affected by a prior motive to falsify or the more general restriction on the admissibility of documents to those prepared *ante litem motam* would remain. Moreover, the *ante litem motam* restriction would also remain as a factor in a district court's exercise of its discretion to admit the proffer as evidence, whether it is offered under Rule 803(5) or Rule 803(6) and arguably even when offered under Rule 801(d)(1)(B), an issue we do not decide. *See infra* note 13. The government did not offer the proffer as a prior consistent statement of Guida. If the government had offered the proffer under that rule, the district court would have had to consider its collateral relevance against its prejudicial effect. *See* Fed. R.Evid. 401, 403. The possible prejudice involved would be especially acute if the government offered the proffer as substantive evidence. *See* 4 *Weinstein's Evidence* ¶ 801(d)(2)(B)[01] at 801–152 to 801–156 & nn. 11–11a (noting generally more rigorous treatment of prior consistent statements offered as

holding does not imply that a proffer prepared by an attorney in a bid for his client's immunity is untrustworthy because the attorney is likely to misrepresent the facts, but only that such an attorney's narrative prepared for the purpose of securing a bid for immunity from criminal prosecution for his client is an example of a case in which the method and circumstances of preparation bear so heavily on the requirement of trustworthiness that it should not be admitted under the hearsay exception for statements prepared in the course of "a regularly conducted business activity."

### 6.

The situation with Guida's notes is somewhat different insofar as Rule 803(6) is concerned. They were taken by Guida as Gabler told his story. Their accuracy would be of great importance if Guida's representation of Gabler was to meet professional standards. As we have already pointed out, the notes were arguably taken before Gabler had fully realized the seriousness of his situation. Thus, in upholding the district court's exercise of discretion in favor of permitting testimony about Gabler's prior consistent statements, we refused to hold as a matter of law that Gabler fully appreciated the seriousness of his situation when he spoke to Guida despite the admittedly false chronology he prepared for his first attorney Scott, Scott's referral of Gabler to a specialist in criminal law and his ready agreement to the option of immunity. Moreover, we are reluctant to state that the notes a lawyer takes when he interviews a client can never be admitted as the lawyer's business records. Where, however, the lawyer who prepared the statement is available to testify and can use the notes to refresh his own recollection, there is no pressing need to admit the notes themselves. Here, Guida was able, with the help of the notes, to remember what Gabler had told him. No one contends that Guida was unable to

testify fully and accurately about Gabler's statements after reviewing the notes he had made. Under these circumstances, in exercising its discretion to admit or exclude Guida's notes, the district court should have revisited the rules on relevance in the context of the government's offer of the notes as Guida's prior consistent statement. Guida's notes were offered under Rule 801(d)(1)(B) after Guida's credibility was attacked only for the purpose of adding credibility to Guida's in-court testimony about the prior consistent statements Gabler had made to Guida out of court. Gabler's prior statements were, in turn, offered only to rehabilitate Gabler's live testimony.[13] In this new context, our holding that the district court did not abuse its discretion in admitting Guida's live testimony about Gabler's statements to him is not controlling. Since Guida's notes were offered to support Guida's testimony, not Gabler's, their relevance, limited at the outset to the issue of Guida's credibility, was further diminished by at least one order of magnitude. Perhaps, to borrow another mathematical analogy, their relevance to the issue of Casoni's guilt could be likened to the infinitesimal higher powers of a variable that the calculus ignores without any practical sacrifice of truth. Accordingly, the district court should have weighed against their cumulative nature and possible confusing effect the greatly attenuated need for them Guida's live testimony created. Had the notes' remote and peripheral relevance been balanced against the effect of emphasizing and reinforcing the government's case that their availability to the jury during its deliberations was likely to have, we think that they should not have been admitted as business records under Rule 803(6) on the facts of this case.

If Guida had been unable to recall Gabler's statements even after he had an opportunity to refresh his recollection with the notes, it might have been appropriate

substantive evidence as opposed to rehabilitative evidence).

**13.** Since the notes and proffer were here offered and admitted only to *prove Gabler made the*

statements they contain, we do not reach the problem of infinite regress inherent in Rule 801(d)(1)(B) that their offer as Guida's prior consistent statement would pose.

to consider their admissibility as recorded recollection under the terms and conditions of Rule 803(5). Under Rule 803(5), a recorded recollection is admitted only if the witness, after reviewing his records, is unable to testify from memory about the events recorded. *See, e.g., In re Japanese Elec. Prods. Antitrust Litig.*, 723 F.2d 238, 303 (3d Cir.1983), *rev'd in part on other grounds sub nom. Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Rule 803(5), in dealing with recorded recollection, provides:

> A memorandum or record concerning a matter about which a witness once had knowledge but now has insufficient recollection to enable the witness to testify fully and accurately, shown to have been made or adopted by the witness when the matter was fresh in the witness' memory and to reflect that knowledge correctly [is admissible]. If admitted, the memorandum or record may be read into evidence but may not itself be received as an exhibit unless offered by an adverse party.

Under Rule 803(5), therefore, admission into evidence of the exhibits that themselves embody the notes would be precluded. Thus, even if Guida had no recollection of Gabler's statements and the district court had decided the notes were thus admissible under Rule 803(5), the notes could not have been admitted as an exhibit and allowed to go out with the jury.[14] Casoni may have had these requirements of Rule 803(5) in mind when he objected to anything beyond Guida's testimony itself. In any event, we think that classification of the notes as recorded recollection under Rule 803(5) could appropriately balance the law's preference for live testimony against the principle that a factfinder should not be deprived of relevant evidence and, at the same time, avoid the prejudicial emphasis likely to be present when Guida's notes remained before the eyes of the jurors dur-

ing their deliberations. Thus, imposition of Rule 803(5)'s limitations on the records a lawyer makes of client statements for the lawyer's use in preparing for litigation may often be better suited to the pursuit of truth within our adversary system than their classification as business records admissible under Rule 803(6).

In any event, though the notes have greater indicia of trustworthiness than the proffer, we nevertheless hold that on this record the district court should not have admitted them after Guida, their preparer, was able to testify fully about their contents after he had used them to refresh his recollection about what Gabler told him.

Our analysis in terms of relevance makes it unnecessary for us to decide that an attorney's notes setting forth statements a client made to him in connection with a legal matter for which he had been retained are never admissible under Rule 803(6). Rather, we merely hold on the record before us that the district court erred in admitting both Guida's notes and the proffer he prepared, as evidence of Gabler's prior consistent statements to Guida, and then compounded that error by receiving them as exhibits and letting them go out with the jury.

### D.

▮ Of course, any error in admitting the proffer compels us to vacate Casoni's convictions only if it was prejudicial and not harmless. *See Stevens*, 935 F.2d at 1406–07.

The government provided a great deal of untainted evidence which justified the jury in convicting Casoni. Gabler's testimony was corroborated in its essential parts by the testimony of Carlson and Semmelman.

Carlson testified about the first meeting and the possible ways that Reeher mentioned GEM and the Agency could work together. Carlson also testified about the second meeting which took place in Harris-

---

**14.** Wigmore and McCormick would allow "the admission of all prior, accurate recorded statements even if the witness still retains some recollection of the facts," 4 *Weinstein's Evidence* ¶ 803(5)[01] at 803–158, but the rule would still bar their receipt as exhibits. Weinstein says that Rule 803(5) is narrower than the position advocated by Professors McCormick and Wigmore. *Id.*

burg. It was at this meeting that Carlson remembered Reeher's suggesting that Casoni be employed by GEM, that the Agency would contract with GEM for supplemental pre-claims assistance and that Casoni's pay would be tied to the GEM/Agency contract and that Reeher and Casoni should be given a fifty percent interest in GEM.

Semmelman testified about Gabler's coming to him seeking advice on the propriety of the deal Reeher offered. Semmelman stated that the proposed arrangement was objectionable on legal and ethical grounds. He thought that any arrangement involving Casoni but not Reeher would also be objectionable. Semmelman also testified about Casoni's visit to Semmelman's office where Casoni told Semmelman that under Pennsylvania law, as long as the GEM/Agency and Agency/Casoni contracts were both disclosed to the Agency's Board of Directors, the proposed arrangement would comport with all legal and ethical obligations. Semmelman also testified that when GEM was being formed, there would be either six or seven directors on GEM's board, the seventh being Casoni if the GEM/Agency contract was consummated.

Robert Buffington (Buffington), an Agency employee, testified about how Casoni instructed him to provide GEM with certain Agency information on an urgent basis. This information facilitated the implementation of the GEM/Agency contract. Another Agency employee, William Berkoben, testified about Casoni's preference to contract out the supplemental pre-claims assistance work. He also noted that when he asked Casoni about his plans after he left the Agency, Casoni spoke only of traveling.

Charles Russell (Russell), also an Agency employee, testified that he was instructed by Casoni to work with the people at GEM to help GEM do the best it could. This included traveling to Massachusetts and helping GEM establish its computer facilities. While Casoni's directives to Russell and Buffington were given before Casoni's contract with GEM was executed, Casoni had already sent a signed employment con-tract to GEM although this version of the contract was rejected by Gabler. Russell also asked Casoni what he would be doing after he left the Agency and Russell testified that Casoni evaded the question.

Leslie Sheesler, also an Agency employee, testified that Casoni requested a copy of an Agency report from her in 1987. She thought that Casoni still worked with the Agency on a consulting basis. At this time, Casoni was on the GEM payroll.

Other testimony was provided by people outside the Agency. James Henderson (Henderson), an insurance agent in Harrisburg, testified that Casoni gave him $2,400.00 in cash and that he then wrote a check on his insurance agency's account to Reeher in the same amount. Although Henderson understood that the check was somehow related to rent for Reeher's beach house, he did not understand why the check itself was necessary. Bill Galbraith testified that Casoni bought air conditioners from him and asked that they be installed at Reeher's house. Finally, the government's case included the testimony of Jean Hake, a hotel employee, to establish that Casoni made Gabler's hotel reservations in Harrisburg. This testimony overwhelmingly supports Casoni's convictions on interstate travel in aid of racketeering.

Faced with this overwhelming evidence, we have little difficulty in holding that oral presentation of all or part of the proffer to the jury and passing reference to its contents in argument or instruction would be harmless. Moreover, as we have noted in Part V.B. of this opinion, the suggestive language, the legal opinions and the extraneous hearsay references to statements by persons other than Gabler that appeared in the proffer but not in the notes were not materially significant as evidence of Casoni's guilt. They were at best peripheral to the limited purpose for which the proffer was admitted and at worst merely cumulative to the other evidence the government presented against Casoni. The jury's knowledge of these statements does not lead us to believe there was any likelihood Casoni would have escaped conviction if they had been redacted from the proffer

before the district court admitted it. Once again, however, the jury's possession of the proffer during deliberation is troubling. Its availability for easy reference during deliberations was likely to have heightened its effect. Thus, we will consider whether the availability of the improperly admitted proffer to the jury during its deliberations requires reversal of Casoni's convictions.[15]

The Second Circuit faced a situation similar to Casoni's in *United States v. Quinto*, 582 F.2d 224, 235 (2d Cir.1978). There, the district court had allowed a memorandum prepared by Internal Revenue Service (IRS) agents to be admitted into evidence and taken out by the jury while deliberating. The IRS memorandum was prepared after an interview with the defendant. *Id.* It contained Quinto's statements to the agents during the interview. It was admitted under the rule applicable to prior consistent statements as substantive evidence. *Id.* at 233–35. The court stated:

> [W]e have little doubt that once the jury had retired to the privacy of their deliberations, the document which we have held to have been improperly admitted probably became the single most important piece of evidence, testimonial or documentary, against Quinto, for "[t]he jury thus had before it a neat condensation of the government's whole case against the defendant. The government's witnesses in effect accompanied the jury into the jury room. In these circumstances we cannot say that the error did not influence the jury, to the defendant's detriment, or had but very slight effect."

*Id.* at 235–36 (quoting *United States v. Ware*, 247 F.2d 698, 700–01 (7th Cir. 1957)).[16]

Here, as in *Quinto*, the problem was compounded when the jury was allowed to consult the proffer during its deliberations. Had the proffer been a business record this would not have conflicted with the provisions of Rule 803(6), but it was in direct conflict with Rule 803(5)'s final provision on expressly restricting the use of recorded recollection. That part of Rule 803(5) states even "[i]f admitted, the memorandum or record may be read into evidence but may not itself be received as an exhibit unless offered by an adverse party." Fed. R.Evid 803(5).

In *United States v. Wright–Barker*, 784 F.2d 161, 174 (3d Cir.1985), on the other hand, the Court held that the jury's possession of an inadmissible written narrative during deliberations was harmless. *Wright–Barker* is, however, readily distinguishable from Casoni's case on the basis of its rationale for holding that the jury's possession of an inadmissible narrative was harmless error. There, we said the error was harmless because "the jury does not have before it a hearsay summary of the government's *whole* case." *Id.* (emphasis original).

*Asher* is another case in which we held that improper admission of a proffer of immunity was harmless error. Casoni's case differs from Asher's. The evidence in the proffer against Asher was far more damaging to him in the context of the whole case than Guida's proffer against Casoni. In *Asher*, the proffer contained material evidence not otherwise produced.

---

**15.** The proffer is a shaped and organized version of the notes. The notes themselves, even if improperly admitted, do not contain the independently improper opinion and hearsay statements Guida included in the proffer. Thus, if the availability of the proffer to the jury during deliberations was harmless, we believe it follows that furnishing the notes to the jury in violation of the strictures of Rule 803(5) would also be harmless. The notes add nothing to the proffer. They are cumulative evidence of some of the statements in the proffer.

**16.** Our earlier analysis of Rule 801(d)(1)(B) shows that we are not in full agreement with the

reasoning of the Court of Appeals for the Second Circuit in *Quinto*. The *Quinto* court, in reversing, held that the memo was irrelevant to the rehabilitation of the agent's testimony, and was not made prior to the motive to fabricate thus rendering it inadmissible under Rule 801(d)(1)(B). *Id.* at 234–35. To the contrary, we have held that Guida's proffer on behalf of Gabler was plainly relevant for this purpose and that the motive to fabricate Casoni asserts did not make Gabler's prior statement inadmissible for the limited purpose it was offered under Rule 801(d)(1)(B) in this case.

Still, we held its admission was harmless error.[17] *See Asher*, 854 F.2d at 1500. To some extent, this distinction in favor of the government is balanced, however, by the fact that it does not appear from any of the three opinions in *Asher* that the improperly admitted proffer was available to the jury during deliberations.

Other cases in which we held that improperly admitted evidence was harmless error could be cited and compared, but we think citation or discussion of cases that hold a particular error is harmless adds little to our discussion of the particular issue we face here. The standard for judging whether a particular error is harmless has an irreducible element of subjectivity. *See, e.g., Stevens*, 935 F.2d at 1406 ("[W]e think it possible that the admission of evidence about the ... robbery might have swayed the jury toward acquittal."); *see also Asher*, 854 F.2d at 1501 (Sloviter, J., concurring) (citing cases). Guida's proffer neatly summarized the government's case against Casoni, and the jury had that summary for ready reference throughout deliberations.

The proffer Guida prepared was perhaps more damaging and more broadly material to the government's case than the report of the Coast Guard official that was improperly given to the jury in *Wright–Barker* or the proffer of the witness Smith that we held was harmless error in *Asher*. Absent the other overwhelming evidence against Casoni, we might speculate that its impact could have also been greater than the document that the United States Court of Appeals for the District of Columbia Circuit held was harmless error in *United States v. Treadwell*, 760 F.2d 327, 340 (D.C.Cir. 1985) (one page summary of F.B.I. agent's testimony was cumulative and therefore harmless), *cert. denied*, 474 U.S. 1064, 106 S.Ct. 814, 88 L.Ed.2d 788 (1986). Still, as Judge Sloviter noted in her concurring opinion in *Asher*, "[t]he Supreme Court has 'consistently made clear that it is the duty of a reviewing court to consider the trial record as a whole and to ignore errors that

are harmless, including most constitutional violations.'" *Asher*, 854 F.2d at 1501 (quoting *United States v. Hasting*, 461 U.S. 499, 509, 103 S.Ct. 1974, 1980, 76 L.Ed.2d 96 (1983)). In *Asher*, Judge Sloviter went on to say:

> [I]f the defendant had counsel and was tried by an impartial adjudicator there is a strong presumption that any other errors that may have occurred are subject to harmless error analysis.... Where a reviewing court can find that the record developed at trial establishes guilt beyond a reasonable doubt, the interest in fairness has been satisfied and the judgment should be affirmed.

*Id.* (quoting *Rose v. Clark*, 478 U.S. 570, 579, 106 S.Ct. 3101, 3106, 92 L.Ed.2d 460 (1986)).

 In our case, the proffer, as well as the notes, were basically consistent with both Gabler and Guida's testimony at trial. They added no significant material evidence of Casoni's guilt to the independent evidence that Carlson and Semmelman, GEM's president and general counsel, as well as Gabler, gave of their dealings with Casoni. This and the other evidence against Casoni was so overwhelming that we think it highly probable that the jury would have convicted him even without their admission. On this record, the information in the notes and proffer was merely cumulative. Despite the proffer's extraneous hearsay statements by persons other than Guida and Gabler, the opinions Guida inserted into it and the potential emphasis that Guida's skillfully shaped narrative placed upon Casoni's guilty role in the events that Gabler testified about, we conclude that the presence of the proffer in the jury room during the jury's deliberations was harmless under the standard we set out in *Government of the Virgin Islands v. Toto*, 529 F.2d 278 (3d Cir.1976). There, we said:

> Unless [we] believe[ ] it highly probable that the error did not affect the judgment, [we] should reverse.,

That difference is of no significance to our harmless error analysis.

---

17. The reason we held the proffer against Asher was inadmissible was also different, *viz.* Asher had not attacked the declarant's credibility.

**918**

*Id.* at 284 (quoting R. Traynor, *The Riddle of Harmless Error* 35 (1970)).

The independent untainted evidence of Casoni's guilt was so great as to be overwhelming, the information in the proffer aside from its peripheral hearsay and opinion statements was no more than cumulative and the hearsay and opinion statements themselves were *de minimis* in relation to the independent evidence of guilt. *See Commonwealth v. Story,* 476 Pa. 391, 383 A.2d 155, 164–66 (Pa.1978) (even when test is whether error is harmless beyond a reasonable doubt, error is harmless if overwhelming evidence of guilt is uncontradicted and the tainted evidence is merely cumulative or *de minimis*).[18] Moreover, *Wright–Barker* indicates this Court is unwilling to go so far as the Seventh Circuit did in *United States v. Ware,* 247 F.2d 698, 700–01 (7th Cir.1957), where the jury's improper possession of notes made by narcotics agents was held to be reversible error. Casoni's case occupies a middle ground between *Ware* and *Wright–Barker.* Though it is close to *Quinto,* we find that decision unpersuasive because of the strength of the government's untainted, independent evidence against Casoni.

Accordingly, we hold, on this record, "that it is *highly probable* that the [wrongly admitted] evidence" in the jury room "did not contribute to the jury's judgment of conviction." *Government of Virgin Islands v. Toto,* 529 F.2d 278, 284 (3d Cir. 1976).

### VI.

Because the district court's error in admitting Guida's notes and proffer were harmless, we must also consider Casoni's contention that the district court's limitation of his cross-examination of Guida's denied him a fair trial.

Casoni argues that he should have been allowed to cross-examine Guida concerning his use of cocaine and his status as the target of an ongoing criminal investigation. Even though the 1986 investigation concerning Guida's drug use had ceased by the time he took Gabler's statements, Casoni argues that Guida was still "vulnerable on those charges" in 1987. Brief of Appellant at 27. Casoni points out that Guida was still under investigation at the time of the trial. Although the government informed the trial judge that the investigation was going nowhere, Casoni notes that there is nothing to show that Guida knew that the investigation was going nowhere and, in fact, we take notice of the fact that this or some other investigation of Guida did go somewhere. On May 31, 1991, Guida was sentenced to eleven months imprisonment and fined $5,000.00 after he pleaded guilty to one count of cocaine distribution. David Morris, *Ex-Pa. Prosecutor Gets Prison in Cocaine Case,* Phila. Inquirer, June 1, 1991, at 38. In any event, since bias is always relevant, Casoni argues he should have been allowed to cross-examine Guida on the details of this investigation.

Casoni and Reeher cross-examined Guida concerning his prior relationship with federal and state prosecutors. In addition, Reeher cross-examined Guida concerning his motive to slant the proffer in order to improve his client's bargaining power. This, the government says, gave Casoni his Sixth Amendment "opportunity" to confront Guida. The government also says that the limitations the district court placed on Casoni's cross-examination of Guida in order to protect Guida's privacy were of no significance in the overall picture of the trial.

This Court has given district courts wide discretion in limiting cross-examination. "A restriction will not constitute reversible

---

**18.** Of course, we recognize that Casoni took the stand and so the evidence against him does not stand uncontradicted, as the *Story* formulation requires. Casoni's case does, however, meet all of *Story*'s other requirements for harmless error, even when measured against the high standard of harmless beyond a reasonable doubt

that we reserve for errors of constitutional magnitude instead of the lesser standard of highly probable not to affect the jury that applies to Casoni. See *Toto,* 529 F.2d at 284, rejecting harmless error tests more stringent than highly probable outside the field of constitutional error.

error unless it is so severe as to constitute a denial of the defendant's right to confront witnesses against him and it is prejudicial to substantial rights of the defendant." *United States v. Adams*, 759 F.2d 1099, 1100 (3d Cir.1985) (citing *Government of the Virgin Islands v. Blyden*, 626 F.2d 310, 313 (3d Cir.1980)), *cert. denied*, 474 S.Ct. 906, 106 S.Ct. 275, 88 L.Ed.2d 236 (1986). This case does not implicate the Sixth Amendment's right to confrontation. *See* U.S. Const. amend. VI. The Supreme Court has said the Constitution's "Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way and to whatever extent, the defense might wish." *Delaware v. Van Arsdall*, 475 U.S. 673, 679, 106 S.Ct. 1431, 1435, 89 L.Ed.2d 674 (1986) (quoting *Delaware v. Fensterer*, 474 U.S. 15, 20, 106 S.Ct. 292, 294, 88 L.Ed.2d 15 (1985) (*per curiam*)) (emphasis in *Fensterer*).

 *Van Arsdall* requires us to strike a balance between the constitutionally required opportunity to cross-examine and the need to prevent repetitive or abusive cross-examination. *See id.* The district court may exercise its discretion in this area by imposing reasonable limits on the scope of cross-examination. *Id.; Beros*, 833 F.2d at 465. Thus, a concern for harassment is among the factors a district court can weigh in deciding whether to limit testimony. *Van Arsdall*, 475 U.S. at 679, 106 S.Ct. at 1435; *Beros*, 833 F.2d at 465. Moreover, Rule 403 authorizes a district court in its broad discretion to exclude collateral matters that are likely to confuse the issues. Here, the district court correctly determined that the government's criminal investigation of Guida was factually unrelated to its case against Casoni and Reeher. We detect no abuse of discretion in the district court's ruling precluding cross-examination of Guida about an unrelated criminal investigation.[19]

Finally, even if there had been error in this respect, it too would have been harmless. The overwhelming evidence against Casoni we have recited convinces us that it was highly probable the jury would have convicted Casoni even if he had been allowed fully to cross-examine Guida about Guida's involvement in the United States Attorney's ongoing criminal investigation.

## VII.

In summary, we reject all of Casoni's arguments of error except those with respect to the admission of Guida's notes and proffer. As to them, we further hold that both their admission and their availability to the jury during its deliberations was harmless. We will therefore affirm Casoni's convictions.

---

**19.** The circumstances surrounding the district court's limitation on Casoni's cross-examination of Guida are set forth in part in our opinion *In re Capital Cities/ABC, Inc.'s Application for Access to Sealed Transcripts*, 913 F.2d 89 (3d Cir. 1990), a proceeding in which a television network sought access to the transcript of the *in camera* discussion during Casoni's trial concerning Guida's involvement in the government's criminal investigation against Guida.