53 F.3d 329
NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
 PROFESSIONAL MOBILE HOME BROKERS, INCORPORATED, Plaintiff-Appellant,
v.
SECURITY PACIFIC HOUSING SERVICES, INCORPORATED, Defendant-Appellee.
 No. 94-1910.
 United States Court of Appeals, Fourth Circuit.
 Argued April 4, 1995.
Decided May 3, 1995.
 
 Appeal from the United States District Court for the Middle District of North Carolina, at Winston-Salem. William L. Osteen, Sr., District Judge. (CA-92-315-6).
 ARGUED: Joseph W. Moss, Amiel J. Rossabi, ADAMS, KLEEMEIER, HAGAN, HANNAH & FOUTS, Greensboro, NC, for appellant.
 Larry Bruce Sitton, SMITH, HELMS, MULLISS & MOORE, L.L.P., Greensboro, NC, for appellee. ON BRIEF: Gregory G. Holland, John J. Korzen, SMITH, HELMS, MULLISS & MOORE, L.L.P., Greensboro, NC, for appellee.
 M.D.N.C.
 AFFIRMED.
 Before HAMILTON, WILLIAMS, and MOTZ, Circuit Judges.
 OPINION
 PER CURIAM:
 
 
 1
 This appeal stems from claims arising out of a contractual relationship between a mobile home dealer and a financing company. After all evidence had been presented, the district court granted the defendant financing company's motion for judgment as a matter of law. We affirm.
 
 I.
 
 2
 The facts giving rise to this dispute are many and complicated; the trial in which they were developed consumed eight trial days. We set forth herein only those facts necessary to understanding our resolution of the case.
 
 
 3
 On July 2, 1984, Professional Mobile Home Brokers (PMHB), a mobile home dealership, entered into a Participation Agreement with General Electric Credit Corporation (GECC). Under the terms of the Participation Agreement, GECC agreed to provide financing to qualifying PMHB customers in exchange for PMHB's promise to "unconditionally guarantee[ ] to GECC the prompt payment and performance by the respective Customers on all Accounts in which GECC ha[d] acquired a participation interest" under the agreement. Pursuant to the Participation Agreement, PMHB took part in a program offered by GECC called the "Accelerated Equity Plan" (AEP).
 
 
 4
 According to the AEP, the dealer and a customer would enter into an installment contract for the purchase of a mobile home, and the dealer would then forward the contract to GECC for financing approval. Following GECC approval, the customer would make payments under the installment contract directly to GECC; however, for accounting purposes, GECC would amortize the loan at two separate interest rates--a "customer rate" and a "dealer rate." The customer rate would always exceed the dealer rate (by a fraction of 1% to over 3%) so that, if the customer continued to make payments, the dealer debt would be satisfied prior to satisfaction of the customer debt. The dealer then would be entitled to every customer installment paid after the dealer debt had been fully paid, minus a monthly service fee assessed by GECC; nonetheless, GECC was entitled to withhold any profit accrued by the dealer on a given installment contract until full satisfaction of the customer debt.[1] Under the AEP, GECC would classify accrued profit as "accumulated excess collateral," and unrealized profit as "potential excess collateral." In the event that a customer would default on a loan, the dealer would only be responsible for the remainder of the debt accrued at the dealer rate. In late 1986, GECC discontinued the AEP. By that date, PMHB had financed the sale of 110 mobile homes under the AEP.
 
 
 5
 By early 1988, seven PMHB customers had defaulted on their loan payments to GECC. Under Sec. 6.2(a) of the Participation Agreement, upon default by the customer, PMHB was allowed thirty days in which to "repurchase" the collateral. Furthermore, if PMHB did not tender payment of the remaining individual debt within thirty days, Sec. 6.2(e) provides that PMHB "shall immediately, upon demand, without requiring tender of the Accounts, repurchase any and all participation in Accounts or furnish a bond satisfactory to GECC guaranteeing performance of this Agreement." Despite these provisions, in the case of each of the seven defaults, GECC permitted PMHB to repossess the mobile home and make any overdue payments on the loan. Provided that PMHB brought a defaulted account to current status and resold the repossessed mobile home within ninety days, GECC continued to conduct business with PMHB without considering PMHB to have breached the Participation Agreement. However, there is no reference to this "ninety-day option" in the text of the Participation Agreement.
 
 
 6
 On April 20, 1988, GECC sent a repurchase request to PMHB on yet another defaulted customer account. PMHB failed to act on the repurchase request and so, on September 13, 1988, GECC sent a notice of default to PMHB, which also informed PMHB:
 
 
 7
 Be advised that GECC intends to at all times enforce the provisions of all agreements and documents delivered to GECC by you in strict accordance with their terms, notwithstanding any conduct or custom on the part of GECC in refraining to do so at any prior time or times.
 
 
 8
 Four days later, Robert Binns, who operated PMHB, responded to the notice of default, indicating "PMHB Inc. is currently making every effort to honor its obligations--if not to the letter then certainly to the intent of the agreement." Shortly thereafter, PMHB paid the total amount due on the April 20 defaulted account.
 
 
 9
 During 1988, Security Pacific Housing Services, Inc. (Security Pacific) began negotiating the purchase of GECC's mobile home portfolio. On May 9, 1989, GECC executed an Asset Purchase Agreement with Security Pacific, whereby Security Pacific purchased all of GECC's rights under its outstanding mobile home installment contracts with PMHB and other dealerships. Among the terms of the Asset Purchase Agreement, GECC and Security Pacific agreed that:
 
 
 10
 Except as provided in Schedule 8(i) all dealer agreements related to the Retail Contracts are valid and binding obligations of the parties thereto and are enforceable against such parties in accordance with their terms....
 
 
 11
 Schedule 8(i), with the heading "COURSE OF DEALINGS," referenced "repossessions on recourse accounts" and set forth, in pertinent part, that:
 
 
 12
 A. Dealers are not requested to repurchase accounts until GECC obtains the right to control the unit....
 
 
 13
 1. This will generally be later that the 60 day period provided for under the AEP loan agreement. Generally AEP loan accounts are treated as any other conventional account.
 
 
 14
 * * * *
 
 
 15
 4. The Charlotte Office will generally allow a dealer to make repo payments for ninety days.... Extensions of payments are handled on a case by case basis.
 
 
 16
 On August 11, 1989, prior to completion of the Security Pacific-GECC sale, GECC sent a repurchase request to PMHB regarding another defaulted customer account (the "Harris account"). Exercising its "ninety-day option," PMHB repossessed and renovated the mobile home, paid all overdue amounts on the Harris account and located a new buyer. On August 30, 1989, the Asset Purchase Agreement between Security Pacific and GECC became effective and that same day Security Pacific notified PMHB that it had purchased GECC's assets. On September 12, 1989, Security Pacific again notified PMHB of its purchase of GECC's assets, further stating:
 
 
 17
 In the past, GECC indicated that it may not in every case strictly enforce its repurchase or payoff request. Instead, GECC indicated that, in lieu of repurchase or payoff, it may allow you to either transfer repossessed units to your floor-plan under certain conditions, or pay the monthly installments due on the contract under certain conditions[i.e. the "ninety-day option"]. GECC also stated that it was not obliged to accept any applications to do so and reserved the right to require you to honor the repurchase or payoff request in accordance with the terms of the written agreement, and that you would be notified in event it became necessary to discontinue the program. This letter shall constitute notification that the above programs established by GECC are discontinued. By this letter, we are hereby notifying you that, effective immediately, you may no longer floorplan repossessions or pay the monthly installments due on the account. From this time forward, we will expect strict compliance with the terms of the AEP agreements as they apply to accounts in default.
 
 
 18
 (Emphasis added.) On September 20, 1989, Binns met with and informed Security Pacific that the repurchase amount he had received from GECC for the Harris account was $1,200 too high. Binns further informed Security Pacific that he had secured a buyer for the Harris home. Security Pacific responded by reiterating that it would not (1) offer the "ninety-day option" to dealers or (2) grant payment extensions to customers or to dealers. Security Pacific relayed to Binns a standing offer of a "walkaway" agreement, whereby Security Pacific would excuse further performance under the terms of the Participation Agreement in exchange for PMHB's rights to any potential excess collateral under its existing customer installment contracts, but PMHB never entered into a "walkaway" agreement with Security Pacific.
 
 
 19
 Over the next few months, Security Pacific sent Binns several differing quotes regarding the amount due on the Harris account, the last of which was postmarked November 16, 1989, in the amount of $12,620.23. While this final quote was the lowest one, PMHB asserts that Binns continued to believe Security Pacific was quoting him the customer rate and not the dealer rate, and so PMHB refused to tender payment. Security Pacific sold the Harris home on December 8, 1989, for $5,000, which was applied to the balance on the Harris account. Security Pacific subtracted the remaining balance from PMHB's accumulated excess collateral.
 
 
 20
 On November 20, 1989, Security Pacific sent another repurchase request to PMHB advising of a defaulted customer account (the "Cooper account"). According to Security Pacific, the balance due on the Cooper account was $15,742.20. Binns responded on December 13, 1989, indicating that $15,742.20 was "not the correct pay off amount" on the Cooper account and that he would "object to any attempt on [Security Pacific's] part to declare [him] in default under the AEP Participation Agreement with regard to this account." PMHB tendered no payments on the Cooper account and, on December 21, 1989, Security Pacific sold the Cooper home for $5,500. Security Pacific again covered the remaining debt on the Cooper account with funds from PMHB's accumulated excess collateral.
 
 
 21
 On December 27, 1989, Security Pacific notified PMHB that it had "defaulted under the terms of the AEP Participation Agreement by failing to repurchase an account in default" and demanded that PMHB repurchase all of its outstanding accounts under the Participation Agreement for $1,168,202.74. Security Pacific warned that if PMHB failed to repurchase its accounts within thirty days, Security Pacific would retain all of PMHB's collateral (i.e. the "installment contracts and proceeds, earnings and reserves arising from these contracts") "in full satisfaction of the indebtedness due under the Participation Agreement pursuant to Section 9-505 of the Uniform Commercial Code."
 
 
 22
 On January 31, 1990, PMHB responded to the repurchase demand with a counterdemand for "the balance outstanding pursuant to the Participation Agreement and Full Recourse Manufactured Time Sales Agreement" in the amount of $139,174.88. PMHB asserted that Security Pacific had "materially breached this contract in several respects, not the least of which is [its] unauthorized illegal demand for payment of $1,168,202.74."
 
 
 23
 On February 26, 1990, Security Pacific responded that, under the terms of the Participation Agreement, PMHB had "defaulted under paragraph 611(a) [sic] by failing repurchase participation (repossessed accounts) within 30 days after demand was made [and] ha[d] defaulted under paragraph 6.2(D) by ceasing to do business as a mobile home dealership." On November 1, 1990, Security Pacific sent another written demand that PMHB repurchase all of its accounts from Security Pacific. In February, 1991, having received no payments from PMHB, Security Pacific formally withheld all of PMHB's collateral in satisfaction of the outstanding account debt.
 
 
 24
 On April 12, 1992, PMHB filed an action in state court alleging unfair and deceptive trade practices, breach of contract, breach of fiduciary duty, and conversion. Security Pacific timely removed the case to the federal court. At the close of evidence, but before the case was submitted to the jury, Security Pacific moved for judgment on all claims, which the district court granted. As to the breach of contract claim, the court concluded that the Participation Agreement was a guaranty that, under the North Carolina statute of frauds, could not be modified absent a signed writing. Because it was undisputed that there was no such writing and that PMHB violated the Participation Agreement, the district court concluded that Security Pacific was entitled to judgment. Alternatively, the district court held that even if the Participation Agreement had been modified by a course of dealing between the parties, PMHB had been given reasonable notice that the previous course of dealing between the parties involving the "ninety-day option" would no longer govern and so Security Pacific for this additional reason was entitled to judgment as a matter of law. PHMB asserts both holdings were error, that the district court also erred in granting judgment as to its remaining claims and in certain evidentiary rulings. We address each argument in turn, but because we believe that the district court was correct as to its alternative holding on the contract claim, we do not consider PHMB's claim of error as to the statute of frauds holding.
 
 II.
 
 25
 Neither PMHB nor Security Pacific has cited a North Carolina case that addresses the reinstatement of original contractual terms after a contract has been modified by reliance on a course of conduct, nor have we been able to find such a case. However, with respect to the issue that provided the basis for the district court's alternative holding, the Restatement of Contracts provides commentary directly on point:
 
 
 26
 Ordinarily reliance by the promisee is reasonably foreseeable and makes the modification binding with respect to performance by the promisee under it and any return performance owed by the promisor. But ... the original terms can be reinstated for the future by reasonable notification received by the promisee unless reinstatement would be unjust in view of a change of position on his part.
 
 
 27
 1 Restatement (Second) of Contracts Sec. 89 cmt. d (1981) (emphasis added); see also Wachovia Bank & Trust Co. v. Rubish, 293 S.E.2d 749, 755 (N.C.1982) (citing to Restatement (Second) of Contracts Sec. 89). The Restatement further provides a persuasive illustration of this rule:
 
 
 28
 A is the lessee of an apartment house under a 99-year lease from B at a rent on $10,000 per year. Because of war conditions many of the apartments become vacant, and in order to enable A to stay in business B agrees to reduce the rent to $5,000. The reduced rent is paid for five years. The war being over, the apartments are then fully rented, and B notifies A that the full rent called for by the lease must be paid. A is bound to pay the full rent only from a reasonable time after the receipt of the notification.
 
 
 29
 Id. at Sec. 89 cmt. d, illus. 7 (emphasis added).
 
 
 30
 GECC sent a notice of default to PMHB in September, 1988, which included the following language:
 
 
 31
 Be advised that GECC intends to at all times enforce the provisions of all agreements and documents delivered to GECC by you in strict accordance with their terms, notwithstanding any conduct or custom on the part of GECC in refraining to do so at any prior time or times.
 
 
 32
 One year later, in September of 1989, Security Pacific sent a letter reiterating that the "ninety-day option" previously offered by GECC was "discontinued" and that:
 
 
 33
 .. effective immediately, you may no longer floorplan repossessions or pay the monthly installments due on the account. From this time forward, we will expect strict compliance with the terms of the AEP agreements as they apply to accounts in default.
 
 
 34
 There is no evidence in the record, nor does PMHB contend, that PMHB did not receive these two notices. PMHB thus was given adequate notice that the course of dealing had changed and that the original contract terms had been reinstated. See 3 Samuel Williston, A Treatise on the Law of Contracts Sec. 7:37, at 609 (Richard A. Lord ed., 4th ed.1992) ("to the extent that the contract as modified is not fully performed, and to the extent that no injustice will be worked as a result of a party's reliance upon the promise modifying the original obligation, the original obligation may be reinstated as to executory portions of the contract remaining to be performed"). In addition, requiring PMHB to adhere to the actual terms of the Participation Agreement does not amount to an injustice in this case. See Restatement Sec. 89 cmt. d. PMHB was given almost a year to prepare for strict enforcement of the agreement. Moreover, Security Pacific did not sell the Harris home and extract the remaining funds from PMHB's accumulated excess collateral until December 8, 1989, almost a year after it sent the first notice and three months after it sent the second.
 
 
 35
 PMHB asserts, however, that Security Pacific first breached the Participation Agreement in two respects, thus providing PMHB with defenses for its own breach. First, PMHB contends that it never received its accumulated profits with respect to the George and Zack accounts. The record reveals that James George forged the signature of a GECC representative on an insurance check he received after the home he purchased from PMHB was destroyed; but PMHB produced insufficient evidence to support any reasonable conclusion that Security Pacific ever received these converted insurance funds. As for the Zack account, the invoice produced by PMHB at trial indicates that this account was paid on December 30, 1989. By that date, PMHB had already breached the Participation Agreement and had received a notice of default under the agreement from Security Pacific. Therefore, even if Security Pacific withheld the accumulated profits from the Zack account after the account had been paid, it was entitled to do so under the terms of the agreement in light of PMHB's prior breach.
 
 
 36
 Secondly, PMHB contends that Security Pacific provided inaccurate repurchase balances following the defaults of the Harris and Cooper accounts. Although the record contains ample evidence of this dispute, there is no evidence that Security Pacific breached the Participation Agreement, which provides:
 
 
 37
 All statements of account rendered by GECC to Dealer relating to Dealer's obligations, including all statements of principal, interest, expenses, and costs owing by Dealer to GECC, shall be presumed correct and accurate and constitute an account stated between Dealer and GECC unless, within thirty (30) days after receipt thereof by Dealer, Dealer shall deliver to GECC by mail addressed to GECC at GECC's principal place of business written objection thereto, specifying the error or errors contained in any such statement.
 
 
 38
 (Emphasis added.) Apart from testimony that PMHB generally disagreed with the figure, the only evidence regarding PMHB's objection to the Harris repurchase sum was that Binns orally communicated his disagreement as to the figure at a meeting with Security Pacific on September 20, 1989. This occurred more than thirty days after the August 11 repurchase request on the Harris account. Moreover, the record contains no evidence that Binns ever placed his objection in writing. Thus, PMHB failed to follow the procedures set forth in the Participation Agreement. Similarly, with respect to the Cooper account, although PMHB did send Security Pacific a written objection to the repurchase amount within thirty days as required by the Participation Agreement, the objection merely states that the sum requested by Security Pacific was "not the correct pay off amount." Nowhere did PMHB state what it considered to be the correct amount. Therefore, PMHB again neglected to follow the agreed procedures by not "specifying the error or errors contained in any[repurchase] statement."
 
 
 39
 PMHB contends that Security Pacific also breached provisions "not specifically addressed in the Participation Agreement."[2] PMHB argues that the Participation Agreement does not address all aspects of the AEP and, therefore, the agreement is not fully integrated. PMHB's argument is contrary to the explicit language of the agreement which states that: "This Agreement ... is in lieu of all contracts or undertakings, either oral or written, heretofore or now existing between the parties, with respect to such participations and neither party shall be bound by anything not expressed herein." This merger clause indicates that the agreement was indeed fully integrated. See Allen v. Weyerhaeuser, 381 S.E.2d 824, 826 (N.C.App.1989). Thus, any evidence of collateral agreements with respect to the AEP is immaterial to the parties' duties under the Participation Agreement.
 
 
 40
 Accordingly, even viewing the evidence most favorably to PMHB, there is insufficient evidence to support a finding that Security Pacific breached the Participation Agreement. As the district court concluded, Security Pacific was entitled to judgment as a matter of law on the breach of contract claim.
 
 III.
 
 41
 We further agree with the district court that PMHB's failure to demonstrate a breach of the agreement is essentially fatal to the remainder of its claims in this case. First, because Security Pacific did not breach the Participation Agreement, PMHB cannot sustain a claim of unfair trade practices under N.C. Gen.Stat. Sec. 75-1.1. At a minimum, Sec. 75-1.1 would have required PMHB to demonstrate that Security Pacific breached the Participation Agreement and that there were additional aggravating factors surrounding the breach. See Bartolomeo v. S.B. Thomas, Inc., 889 F.2d 530, 535 (4th Cir.1989) ("[a] simple breach of contract, even if intentional, does not amount to a violation of [N.C. Gen.Stat. Sec. 75-1.1]; a plaintiff must show substantial aggravating circumstances attending the breach to recover under [Sec. 75-1.1] ..."); United Roasters, Inc. v. Colgate-Palmolive Co., 649 F.2d 985, 992 (4th Cir.), cert. denied, 454 U.S. 1054 (1981). In light of PMHB's failure to demonstrate a breach of contract,[3] the district court correctly determined that Security Pacific was entitled to judgment as a matter of law on this claim.
 
 
 42
 The district court also properly resolved PMHB's breach of implied duty of good faith claim in favor of Security Pacific. No reasonable juror could have concluded that Security Pacific did not discharge its duties under the contract in good faith in compliance with its obligations under North Carolina law. See Id . at 990; N.C. Gen.Stat. Sec. 25-1-203. The record contains insufficient evidence to create a triable issue as to whether Security Pacific acted honestly in enforcing the literal language of the Participation Agreement. Rather, the evidence is that Security Pacific notified PMHB well in advance that PMHB would be expected to comply with the strict language of the agreement.
 
 
 43
 PMHB's claim that Security Pacific committed the tort of conversion by "refusing to pay [PMHB] its earnings on accounts that were paid off, or to credit [PMHB] with such earning to satisfy [PMHB's] obligations on the Harris and Cooper homes" fares no better. Under North Carolina law, conversion requires proof that (1) the plaintiff had an ownership interest in the property and (2) the defendant wrongfully converted the property to its own use. Wall v. Colvard, Inc., 149 S.E.2d 559, 564 (N.C.1966). The district court concluded that, as a matter of law, PMHB could not sustain its claim of conversion in the absence of proof that Security Pacific breached the Participation Agreement. We agree. The Participation Agreement provides:
 
 
 44
 GECC shall, upon payment of such sum to Dealer as is mutually agreeable, acquire a 100% participation in the subject Account for such period of time and in such amount of the Total of Payments as is noted on the transmittal delivered to Dealer with GECC's check or draft given in payment for the participation.
 
 
 45
 Thus, GECC and Security Pacific, not PMHB, had a complete ownership interest in all accumulated excess collateral on a given customer account until such time as the account was paid in full; PMHB had no rights to the earned excess collateral until the entire customer loan was paid. Security Pacific acted within its contractual rights in apply ing PMHB's earned excess collateral toward the balances of the defaulted Harris and Cooper accounts.
 
 
 46
 Finally, PMHB's contention that the court below erred with regard to its claim that Security Pacific "breached its fiduciary duties" to PMHB is meritless. " 'The mere existence of a debtor-creditor relationship between [the parties does] not create a fiduciary relationship.' " Branch Banking and Trust Co. v. Thompson, 418 S.E.2d 694, 699 (N.C.App.) (quoting United Virginia Bank v. Air-Lift Assocs., Inc., 339 S.E.2d 90, 94 (N.C.App.1986)), review denied, 421 S.E.2d 350 (N.C.1992). When the relationship between the parties is merely contractual, there can be no fiduciary duty on either side. Thompson, 418 S.E.2d at 669. Rather, for a fiduciary relationship to arise, a "special duty" must exist "beyond the terms of the contract...." Id. There is no basis for a special duty--or indeed any duties outside those in the Participation Agreement--in this case in which we have a debtor-creditor relationship between two business concerns. Accordingly, the district court properly granted judgment to Security Pacific on PMHB's tort claims.
 
 IV.
 
 47
 PMHB also challenges several evidentiary rulings of the district court. First, it argues that the district court improperly excluded evidence of Security Pacific's dealings with other mobile home dealers, which, PMHB argues, would have helped to establish a"scheme" orchestrated by Security Pacific in violation of N.C. Gen.Stat. Sec. 75-1.1. Similar happenings evidence "in the form of contracts or transactions involving neither of the parties" is admissible only "where the judge finds that the risk of wasted time and confusion of issues does not substantially outweigh the probative value of the evidence of other transactions." 1 McCormick on Evidence Sec. 198, at 839-40 (John W. Strong ed., 4th ed.1992). After careful consideration, the district court concluded that the proffered evidence of Security Pacific's business relationships with other AEP dealers "would tend to add at least as much confusion to the issue as it would to resolving the issues," so it excluded the evidence under Fed.R.Evid. 403. In doing so, the district court did not abuse its discretion. See Schultz v. Butcher, 24 F.3d 626, 631 (4th Cir.1994); United States v. Lopez, 611 F.2d 44, 45 (4th Cir.1979).
 
 
 48
 PMHB next challenges the admission of testimony by Keith Swana and J. David Freeman. Security Pacific failed to identify these witnesses as persons having knowledge of matters raised in the lawsuit in response to interrogatories filed by PMHB. Accordingly, PMHB maintains that the district court erred in permitting Swana and Freeman to testify. However, the district court ordered Security Pacific to make both witnesses available to PMHB prior to trial so that PMHB would have an opportunity to depose either or both of them. This was an appropriate remedy in light of the circumstances and, therefore, the district court did not abuse its discretion in allowing both Swana and Freeman to testify at trial. See DesRosiers v. Moran, 949 F.2d 15, 22 (1st Cir.1991) ("[o]rdinarily, if a failure to make timely discovery comes to light before or during trial, the remedy is to order the information produced and to take immediate steps to cure any prejudice"). As the court emphasized, both Swana and Freeman were named in documents that PMHB received during the course of discovery--they were not surprise witnesses.[4]
 
 
 49
 PMHB also asserts that the trial court erred in admitting computerized Pay Off System (POS'M) records. The POS'M records track the status of individual customer accounts as of a specified date. While these reports are clearly hearsay, see Fed.R.Evid. 801(c), they were properly admitted pursuant to Rule 803(6)--the business records exception. The district court allowed extensive voir dire regarding the admissibility of the POS'M records and then concluded that the elements of the business records exception had been satisfied. PMHB contends that the POS'M reports should not have been admitted because the proponent of the records, Swana, did not prepare the reports and was unable to testify to the accuracy of the information contained therein. However, neither of these considerations is relevant to the admissibility of the POS'M reports under the business records exception. United States v. Duncan, 919 F.2d 981, 986 (5th Cir.1990). Moreover, as the district court recognized, the accuracy of the POS'M reports themselves is an issue relevant to credibility--to be explored on cross-examination--not admissibility. Once the elements of the business records exception have been satisfied, a rebuttable presumption of accuracy attaches to the document. United States v. Casoni, 950 F.2d 893, 909 (3d Cir.1991); United States v. Snyder, 787 F.2d 1429, 1433-34 (10th Cir.), cert. denied, 479 U.S. 836 (1986). PMHB had the opportunity to rebut that presumption by introducing evidence that the figures contained in the POS'M reports were inaccurate. Accordingly, the district court did not err in admitting these records.[5]
 
 V.
 
 50
 For the reasons set forth above, the decision of the district court to grant judgment as a matter of law in favor of Security Pacific is
 
 
 51
 AFFIRMED.
 
 
 
 [1]
 Most GECC loans were for a term of fifteen years. In the typical case, the balance on the dealer loan would be paid in full after twelve years, thereby entitling the dealer to the accumulated customer payments over the remaining three years once the customer loan was fully paid. Such was never the case with PMHB, however, since its participation under the terms of the agreement only lasted six-and-a-half years. Thus, the only way PMHB received profits under the Participation Agreement was when a customer paid off the balance prior to term
 
 
 [2]
 For example, PMHB asserts that it did not receive monthly status reports on customer AEP accounts after August of 1989 and was not notified of the abandonment of the Cooper home until two months after the fact
 
 
 [3]
 PMHB contends that its unfair trade claim "is not premised solely on a breach of the participation agreement" but is also "based on [Security Pacific's] scheme to convert the dealer investment and earned, accumulated and potential excess collateral of all GECC AEP dealers, and the implementation of that scheme." However, as we have noted, the Participation Agreement specifically provides Security Pacific with the right to retain all customer account proceeds until such time as the account is paid in full. Thus, Security Pacific did not "convert" any PMHB funds by withholding accumulated excess collateral until full payment of an outstanding customer loan. See infra
 
 
 [4]
 PMHB also objects to the admission of Freeman's handwritten calculation of the repurchase amount due on the Harris account. PMHB argues that it had never seen this handwritten document prior to the time of its introduction at trial. However, the document did not exist prior to trial. Rather, Freeman produced the calculation during the course of the trial as an itemization of the original August 11, 1989, Harris repurchase request sent to PMHB. Counsel for PMHB was given a full opportunity to cross-examine Freeman on his methods of calculation, so it was not error to admit the handwritten version of Freeman's testimony
 
 
 [5]
 PMH also offers four cursory objections to the district court's exclusion of trial testimony; these objections are meritless. The court acted within its discretion in excluding the challenged testimony and, in any event, any alleged error is harmless in view of the voluminous evidence in this case. None of the excluded testimony could possibly have affected the district court's ruling on the Rule 50 motion