Affirmed and Memorandum Opinion filed April 22, 2008








Affirmed and Memorandum Opinion filed April 22, 2008.

 

 

In The

 

Fourteenth Court of
Appeals

____________

 

NO. 14-06-00752-CR

____________

 

TAMISHEA LANETTE WILLIAMS, Appellant

 

V.

 

THE STATE OF TEXAS, Appellee

 



 

On Appeal from the 230th
District Court

Harris County, Texas

Trial Court Cause No. 1005182

 



 

M E M O R A N D U M   O P I N I O N

A jury convicted Tamishea Lanette Williams of capital
murder.  Because the State did not seek the death penalty, the trial court
sentenced her to life in prison.  In three issues, appellant challenges the
exclusion of evidence of a witness=s extraneous
offenses, invocation of a witness=s privilege
against self-incrimination, and admission of a witness=s prior consistent
statement.  We affirm.

 








Factual Background

In late March 2004, Christopher Allen and Williams decided
to purchase ecstasy pills from a friend of Allen=s and resell the
drugs for a profit.  How they came to this agreement was disputed at trial. 
Allen testified that Williams asked him to earn some money for her by
gambling.  Allen alleges he won between $1500 and $1700 gambling at a club with
Williams=s money.  Williams
divided the money with Allen, and Allen left the club.  Williams then returned
to the club and lost her half of the winnings.  Allen testified that Williams
called him and asked that he return to the club to help her recoup her losses. 
Allen returned to the club, but declined Williams=s request to help
her win the money back.  Allen further testified that Williams approached him
two or three days later and proposed a drug deal to recoup her gambling
losses.  Williams instructed Allen to raise $6500 with which to purchase
ecstasy pills.  Allen raised the money with the help of Daniel and Amin Fields.

On March 24, 2004, Williams and Allen agreed to meet at her
home to purchase the drugs.  Allen testified that Williams asked him to drive
into her garage as her children would be asleep in the house.  Both Williams
and Allen testified that Allen drove to her home, called from the driveway so
that Williams could open the garage door, and Allen drove directly into
Williams=s garage.  The
garage door would not stay open, Williams told Allen, so she closed it after
Allen drove into the garage.  Allen=s passenger was
Amin Fields, the complainant.  








Allen testified that after he drove into the garage, he
turned off the ignition, retrieved the cash from the trunk, and began to count
it.  At this time, Williams stepped into the backseat of the car and told
Fields that the drugs were inside the house.  She then left the car, went into
the house, then came back out and got into the backseat again.  Allen testified
that he was still outside the car counting the money when he heard a gunshot. 
Allen dropped the money, opened the garage door, and ran.  As he ran away from
the house, he heard two more gunshots.  Allen eventually called 911 and met a
responding officer at Williams=s house.  By the time the officer arrived
at the house, the car was gone, but there was a large bloodstain in the
driveway.  A search revealed no one inside the home.

Williams told a different story.  She testified that she
never asked Allen to gamble for her, but that Allen had noticed that she had
about $6000 in cash.  Williams testified that she intended to buy bedroom
furniture with the cash, but the furniture was not the right size for her
home.  Williams alleged that Allen proposed the drug deal to make money on
Williams=s $6000.  Williams
agreed to purchase pills from Allen and set up the transaction at her home.  As
described by Allen, he drove into her garage with Fields as his passenger. 
Williams testified that she opened the garage door for Allen, then went back
inside the house to get the money.  She kept a gun in the bag that held the
money.  She got into the backseat of the car with the bag as Allen stepped out
of the driver=s seat.  She testified that Fields locked the car
doors and began threatening her.  He told her to give him the money or he would
put her in the trunk, drive away, and kill her.  She testified that Fields told
Allen that he should return to the car because they needed to leave.  As Allen
began to walk back to the car, Fields told Williams to get in the trunk. 
Williams testified that she then grabbed her gun, closed her eyes, and shot
once in front of her and twice behind her.  When she opened her eyes she saw
that Fields was slumped over and there was blood everywhere.








Williams testified that she went into the house and told
her sister that she had been robbed and that they needed to get out of the
house before Allen returned Awith other guys@ to try to kill
her.  She testified that she Adumped@ Allen=s car with Fields=s body and drove
her own car to a motel where she checked in under the name of Amy Savoy.  At
the motel she showered, then drove to a police station to report a shooting at
her home.  Williams testified that the police told her to return to her
neighborhood and call 911 from a pay phone.  Williams did so, identifying
herself to the 911 operator as Lavera Green, her sister=s name, and
reported that there were three men in her garage.  She also reported that Allen
fired the shots and that she and her sister had driven away from the house in
her car.  Williams later told the police several different versions of the
incident, which she admitted at trial were false.  She likewise admitted at
trial that she fired the gun at Fields, but only in fear for her life. 

Standard of Review

In each of her issues, Williams challenges the admission or
exclusion of evidence.  We review a trial court=s rulings on the
admission or exclusion of evidence for abuse of discretion.  Apolinar v.
State, 155 S.W.3d 184, 186 (Tex. Crim. App. 2005).

Extraneous Offenses

In her first issue, Williams contends the trial court erred
in excluding evidence of Allen=s unadjudicated extraneous offenses.  In
an unrelated case where Allen was the defendant, the State filed a notice of
intent to use extraneous offenses and prior convictions for impeachment.  In
this document, the State listed several unadjudicated extraneous offenses Allen
allegedly committed.  At trial, Williams testified that she was afraid of Allen
because she knew he had previously assaulted one of his girlfriends and
committed a series of armed robberies at auto parts stores.  Eric Bowman,
district manager of an O=Reilly Auto Parts Store, testified that he
was a victim of an armed robbery at his store on March 19, 2004.  He identified
Allen, a former employee, as one of the robbers.  The aggravated robbery case,
however, was never prosecuted.  In addition to the above testimony, Williams
asked to call Kris Sanders, a former Harris County Assistant District Attorney,
and Detective T. L. King, a Harris County Sheriff=s Deputy, to
testify about Allen=s unadjudicated extraneous offenses.  The
trial court denied Williams=s requests because neither Sanders nor
King had personal knowledge that Allen had committed the offenses.








A witness may not testify to a matter unless evidence is
introduced sufficient to support a finding that the witness has personal
knowledge of the matter.  Tex. R. Evid. 602. 
The admission of Sanders=s and King=s testimony about
Allen=s extraneous
offenses would have violated Rule 602.  Williams argues, however, that the
exclusion of evidence of Allen=s extraneous offenses violated her
constitutional right to present a complete defense, citing Holmes v. South
Carolina, 547 U.S. 319, 126 S.Ct. 1727, 164 L.Ed.2d 503 (2006).

In Holmes, also a murder case, the defendant
attempted to introduce evidence that another person had committed the crime. 
547 U.S. at 322, 126 S.Ct. at 1730.  The trial court excluded the evidence
based on a holding by the South Carolina Supreme Court that evidence of
third-party guilt was inadmissible if the evidence cast only a bare suspicion
of another=s guilt, especially in the face of substantial
forensic evidence.  547 U.S. at 323B24, 126 S.Ct. at 1731. 
The United States Supreme Court recognized that Astate and federal
rulemakers have broad latitude under the Constitution to establish rules
excluding evidence from criminal trials.@  547 U.S. at 324,
126 S.Ct. at 1731.  The Court held, however, that this latitude is limited by
the Due Process Clause of the Fourteenth Amendment as well as the Compulsory
Process Clause and the Confrontation Clause of the Sixth Amendment, which
guarantee criminal defendants a meaningful opportunity to present a complete
defense.  Id.  The Court further held this right is abridged when rules
of evidence infringe upon a weighty interest of the accused and are arbitrary
or disproportionate to the purposes they are designed to serve.  Id. 
The Court pointed to several of its past cases striking down similar rules that
were disproportionate or served no legitimate purpose.  547 U.S. at 325, 126
S.Ct. at 1732B33 (citing Washington v. Texas, 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967) (state
law that barred defendants from presenting the testimony of any co‑defendant,
unless the co‑defendant had been acquitted, but imposed no such
restriction on the prosecution); Chambers v. Mississippi, 410 U.S. 284,
93 S.Ct. 1038, 35 L.Ed.2d 297 (1973) (state Avoucher rule,@ which barred any party from
impeaching its own witness); Crane v. Kentucky, 476 U.S. 683, 106 S.Ct.
2142, 90 L.Ed.2d 636 (1986) (court rule preventing defendant from introducing
evidence bearing on the credibility of his confession after voluntariness had
been determined by the court)). 








Williams argues the trial court abridged her right to
present a complete defense by excluding the State=s notice of
extraneous offenses and the testimony of Sanders and King.  At oral argument,
the State conceded that evidence of Allen=s extraneous
offenses might have been admissible to impeach his credibility.  However,
Williams=s evidence was
excluded because the witnesses did not have personal knowledge of Allen=s extraneous
offenses; therefore, their testimony would have been unreliable.  A rule that
excludes unreliable evidence serves a legitimate interest and does not deny the
accused the right to present a meaningful defense.  Cf. United States v.
Scheffer, 523 U.S. 303, 316, 118 S.Ct. 1261, 140 L.Ed.2d 413 (1998).  

Moreover, the trial court permitted Williams to testify
that she knew Allen had been accused of committing several armed robberies and
that he had assaulted his girlfriend.  By excluding the testimony of Sanders
and King, the trial court did not deny Williams the right to present a
meaningful defense.  We overrule Williams=s first issue.

Fifth Amendment Privilege Against
Self-incrimination

In her second issue, Williams contends the trial court
erred in permitting Allen to invoke his Fifth Amendment privilege against
self-incrimination.  The Fifth Amendment to the United States Constitution
provides that no person shall be compelled in any criminal case to be a witness
against himself.  U.S. Const.
amend. V.  In a memorandum filed at the time of trial, Williams stated that she
wanted to introduce evidence that Allen Acommitted other
crimes, including aggravated robberies, using a deadly weapon, a firearm.@  In her
memorandum, Williams stated she intended to ask Allen whether he committed a
string of armed robberies and whether he was aware that the Harris County
District Attorney=s office had filed a document listing
these offenses.








At trial, Williams reserved cross-examination of Allen
until her case in chief.  Before cross-examining Allen, Williams asked the
trial court to determine whether Allen would be required to answer questions
concerning unadjudicated extraneous offenses.  The trial court held a hearing
at which Allen was represented by counsel.  The trial court determined that the
evidence Williams intended to introduce consisted of unadjudicated offenses. 
Allen=s counsel advised
him to assert his right against self-incrimination.  The trial court held that
Williams could ask Allen about pending charges against him, but that if
Williams asked Allen about the unadjudicated offenses, the court would sustain
the prosecutor=s objection.  At the hearing, Williams did not inform
the trial court that she would also like to ask Allen if he was aware of the
State=s notice of
extraneous offenses, which listed the offenses.  During cross-examination,
Williams asked Allen Aabout the O=Reilly=s robberies.@  The prosecutor
objected and the trial court sustained the objection.  Williams never asked
Allen whether he was aware of the State=s notice of
extraneous offenses.

Williams recognizes that Allen=s Fifth Amendment
privilege overrides her constitutional right to present a defense.  See
Grayson v. State, 684 S.W.2d 691, 696 (Tex. Crim. App. 1984).  She argues,
however, that Allen waived the privilege by testifying on behalf of the State. 
For this proposition, Williams cites Blackmon v. State, 642 S.W.2d 499
(Tex. Crim. App. 1982).  In Blackmon, the court of criminal appeals
concluded that Ait is too broad a statement to suggest
that a witness taking the stand and testifying never waives his privilege
against self-incrimination with respect to extraneous activity.@  Id. at
501.  Instead, the witness may invoke the privilege at the Athreshold@ of Aany particular
transaction or area of testimony@ that is unrelated
to the testimony provided on direct examination.  Id. at 502.








The trial court could have compelled Allen to testify about
potentially incriminating matters only if: (1) the testimony related to the
transaction or Aarea of testimony@ about which he
voluntarily testified on direct examination; or (2) Allen failed to invoke his
privilege at the Athreshold@ of the
questioning regarding extraneous matters.  As detailed above, Allen=s testimony on
direct was limited to the events leading to, and immediately following, the
murder of the complainant.  Further, Allen invoked his Fifth Amendment
privilege at the threshold of questioning regarding the extraneous matters.  

Williams further argues that Allen could not have
incriminated himself by answering her question about whether Allen was aware of
the State=s notice of intent to use extraneous offenses filed in
the unrelated case.  Although Williams raised this issue in her memorandum, she
did not raise it at the hearing before the trial court or ask Allen this
question on cross-examination.  By failing to ask the question and obtain a
ruling from the trial court, Williams failed to preserve error.  See Tex. R. App. P. 33.1.

Even if Williams preserved error and asked Allen whether he
was aware that the State had filed a notice of the extraneous offenses, the
question would have implicated Allen=s Fifth Amendment
right against self-incrimination.  The corollary to the above-cited holding in Blackmon
is that once a witness relates part of a transaction, he should not be
permitted to assert the Fifth Amendment to prevent disclosure of relevant
facts.  See Scott v. State, 940 S.W.2d 353, 357 n. 4 (Tex. App.CDallas 1997, pet.
ref=d).  If Williams
had asked Allen whether he was aware of the State=s notice of
extraneous offenses and Allen had answered, Allen would have risked waiving his
privilege against self-incrimination.  See Draper v. State, 596 S.W.2d
855, 857 (Tex. Crim. App. 1980).  The trial court did not abuse its discretion
by permitting Allen to invoke the privilege.  We overrule Williams=s second issue.

Admission of Prior Consistent Statement








In her third issue, Williams contends the trial court erred
in admitting Spencer Farwell=s videotaped statement to the police as a
prior consistent statement.  Farwell testified on direct examination that he
knew Williams and her sister because they regularly bought marijuana from him. 
On March 24, 2004, the day of the incident, Williams told Farwell that Asome guys@ had stolen $6000
from her.  Williams told Farwell that the Aguy@ who robbed her
had called asking her for ecstasy.  She told Farwell she was planning to recoup
her money from him.  Williams=s sister asked Farwell for a gun so she
could Awatch her sister=s back,@ but Farwell did
not have a gun to give them.  

About three hours later, Williams called Farwell asking if
he knew of a dead-end street in the neighborhood.  When Farwell asked why she
was looking for a dead-end street, Williams replied, AI got these ho-ass
n****s in my garage and I need to find somewhere to dump this car.@  Farwell told
Williams of a dead-end street and hung up the phone.  Less than five minutes
later, Farwell saw Williams and her sister driving by his home.  Williams
stopped the car and Farwell walked up to the passenger side of the car to talk
with her.  He noticed that Williams=s pants were
bloody and also noticed a bag of money on the floor of the car.  Williams asked
Farwell to Aget rid of@ a gun for her. 
Farwell placed the gun in a fast-food bag and hid it with plans to sell it
later.

Two days after the murder, Farwell went to the police,
surrendered the gun, and gave a videotaped statement.  About one month after
giving the statement, Williams asked him what he had told the police.  When
Farwell said he had told the truth, she told him that if he testified in court
as he had testified on the videotape, Ashe knew she was
going to jail.@  Farwell further testified that he had charges
pending against him and that the prosecutor had agreed to Aprobably be a
little lenient,@ but that he had struck Ano specific deal@ in exchange for
his testimony.

On cross-examination, Williams questioned Farwell
extensively about the videotaped statement he gave to police:

Q.  Well, you tell them something and they say to you, Spencer, that
ain=t how it happened, right?  You didn=t tell them this story the first
time you went in, did you?

 

A.  Yes, sir.

 








Q.  Not exactly like this.  It wouldn=t have taken three hours, would it?

 

A.  Well, they just asking the same questions.  I kept giving the same
answers.

 

Q.  And that=s because they didn=t like what you were telling them,
did they?

 

A.  No, sir.

 

Q.  They didn=t want to hear what you had to say,
did they?

 

A.  No.

 

Q.  So, finally after a while, you came around to the version that they
accepted, didn=t you?

 

A.  No, sir.

 

Q.  And that=s the version we=re hearing here today in court.

 

A.  The truth.

 

Q.  And that=s the version that=s going to get you your lenient
sentence.  Am I right?

 

A.  I told the truth.

 

Q.  You think you=d still be down there in the police
station if you hadn=t changed your story?

 

A.  I didn=t change my story.

 








Q.  You didn=t tell them what you just told us
today, did you?  That=s not the first thing you told
them, is it?

 

A.  That=s the truth.

 

[Defense counsel]:  Judge, I would ask he be instructed to answer my
question.

 

THE COURT:  Ask the question again, please.

 

Q.  (By [defense counsel]):  You didn=t tell them this story first when you went to the
police station, did you?  Yes or no?

 

A.  Yes, I told them the truth.

 

Later, during the testimony of Detective Alex Ortiz, the
State sought to introduce Farwell=s videotaped
statement.  Williams objected on the grounds of improper bolstering.  The trial
court admitted the statement as a prior consistent statement to rebut the
suggestion that Farwell=s testimony was fabricated.  

Rule 801(e)(1)(B) permits the admission of prior consistent
statements of a witness Aoffered to rebut an express or implied
charge against the declarant of recent fabrication or improper influence or
motive.@  Tex. R. Evid. 801(e)(1)(B).  The court
of criminal appeals has recognized the following four requirements as set out
by the United States Supreme Court that must be met for prior consistent
statements to be admissible:

(1) the declarant must testify at trial and be subject to
cross-examination;

(2) there must be an express or implied charge of recent fabrication or
improper influence or motive of the declarant=s testimony by the opponent;

(3) the proponent must offer a prior statement that is consistent with
the declarant=s challenged in-court testimony;
and,








(4) the prior consistent statement must be made prior to the time that
the supposed motive to falsify arose.

 

Hammons
v. State, 239 S.W.3d 798, 804 (Tex. Crim. App. 2007) (citing Tome v. United
States, 513 U.S. 150, 156B58, 115 S.Ct. 696, 701, 130 L.Ed.2d 574
(1995)).

Williams contends the State failed to meet the requirements
that there was a charge of recent fabrication and that the prior consistent
statement was made prior to the time the alleged motive to falsify arose.  Rule
801 sets forth a minimal foundation requirement of an implied or express charge
of fabrication or improper motive.  Id.  A[T]here need be
only a suggestion that the witness consciously altered his testimony in order
to permit the use of earlier statements that are generally consistent with the
testimony at trial.@  Id. (quoting United States v.
Casoni,, 950 F.2d 893, 904 (3d Cir. 1991)).  The court of criminal appeals
held that the relevant inquiry is, A[f]rom a totality
of the questioning, giving deference to the trial judge=s assessment of
tone, tenor, and demeanor, could a reasonable trial judge conclude that the
cross-examiner is mounting a charge of recent fabrication or improper motive?@ Id.  at 808B09.  If the answer
to that question is Ayes,@ the trial court
does not abuse its discretion in admitting a prior consistent statement made
before any motive to fabricate arose. 

In this case, the record reflects that two days after the
shooting, Farwell went to the police station, surrendered the gun, and gave a
videotaped statement substantially similar to his testimony at trial.  During
her cross-examination of Farwell, Williams accused Farwell of having told a
story to the police different from what he was telling at trial.  Williams
argues on appeal that she was not accusing Farwell of telling a different story
at trial, but that she was accusing him of telling a different story to the
police when he first arrived at the police station.  Williams claims that
Farwell made an inconsistent statement prior to the videotaped statement before
he was motivated by the deal with the prosecutor to abandon that version and
make the consistent statement that was recorded on videotape.  








In determining whether a prior consistent statement is
admissible, we must review whether a reasonable trial judge could conclude that
the cross-examiner is mounting a charge of recent fabrication or improper
motive.  We review the totality of the circumstances, and are not bound by
Williams=s counsel=s assertion of his
intent during the examination. Reviewing the cross-examination of Farwell and
the totality of the questioning, a reasonable trial judge could conclude that
Williams mounted a charge that Farwell fabricated his testimony specifically
because of the agreement with the prosecutor.  Evidence of his prior statement
rebutted that charge.  The trial court did not abuse its discretion in
admitting the videotaped statement.  We overrule Williams=s third issue and
affirm the judgment of the trial court.

 

 

 

/s/      Jeff Brown

Justice

 

 

 

 

Judgment rendered
and Memorandum Opinion filed April 22, 2008.

Panel consists of
Justices Yates, Guzman, and Brown.

Do Not Publish C Tex. R. App. P. 47.2(b).